OPINION
{¶ 1} Appellant-cross-appellee, Pamela Lilley, appeals various decisions of the Warren County Court of Common Pleas, Probate Division, regarding the estates of G. Randall Lilley and Marion R. Lilley. We affirm in part and reverse in part the probate court's decisions.
 {¶ 2} G. Randall Lilley died testate in December 1991, leaving his surviving spouse, Marion R. Lilley, in addition to one daughter, appellant, and two sons, appellee/cross-appellant, Stephen Lilley, and Christopher Lilley. Randall's will was subsequently admitted to the probate court. The administration of Randall's estate was subject to many challenges and delays, including numerous matters regarding inventory. In January 1997, during the administration of Randall's estate, Marion died testate. Marion's will was also admitted to the probate court.
 {¶ 3} After hearing testimony regarding various exceptions to the inventory of both estates, the probate court issued a decision on those exceptions in February 1999. After Stephen and Pamela filed motions for clarification, the probate court issued a second decision on April 5, 1999. After Pamela filed another motion for clarification, the probate court issued a third decision on April 30, 1999.
 {¶ 4} In June 1999, Pamela filed an appeal in this court of the three decisions issued by the probate court. Stephen filed a cross-appeal. This court determined that the decisions appealed were not final appealable orders, and that it did not have jurisdiction to hear the case. See In re Estate of Lilley (Dec. 20, 1999), Warren App. Nos. CA99-07-083, CA99-07-084, CA99-07-087, and CA99-07-088, 1999 WL 1239470, *3. This court found that the decisions did not settle the final accounts of the estates, but merely ruled on the specifics of various exceptions. Id. This court therefore dismissed the appeal.
 {¶ 5} In June 2001, the probate court magistrate issued a decision finding that Stephen, Pamela, and Christopher owed interest on their obligations to Marion's estate. Stephen filed objections to that decision. The probate court judge sustained Stephen's objections as they related to certain funds owed to the trust account of Christopher Lilley, Jr., Christopher's son. The court overruled the objections in all other regards. Pamela filed a motion asking the court to reconsider its decision regarding interest, which was overruled.
 {¶ 6} In April 2002, Stephen filed a motion requesting that the probate court make findings of fact and conclusions of law pursuant to Civ.R. 52. Ruling that a prior decision satisfied the requirements of Civ.R. 52, the probate court denied Stephen's motion. The court subsequently issued judgment entries settling the final accounts of the estates of Randall and Marion.
 {¶ 7} Stephen appealed various issues regarding the administration of both estates, raising five assignments of error. In one of his assignments of error, Stephen argued that the probate court erred by failing to make findings of fact and conclusions of law as requested. In an unpublished entry, this court sustained that assignment of error. This court ruled that the issues raised in Stephen's remaining assignments of error were not ripe for decision. This court deemed those assignments of error moot, reversed the probate court, and remanded the case for further proceedings.
 {¶ 8} On remand in July 2005, the probate court issued findings of fact and conclusions of law pursuant to Civ.R. 52. The court subsequently vacated those findings of fact and conclusions of law, and issued amended findings of fact and conclusions of law in August 2005. At that time, the court issued a "decision and entry," which referenced the contemporaneously issued amended findings of fact and conclusions of law, denied a motion by Stephen to enter judgment, and ruled moot a motion by Pamela for reconsideration/clarification. Asserting that all issues related to the administration of the estates are ripe for review, Pamela now appeals to this court, assigning three errors.[1] Stephen assigns one error on cross-appeal.
 {¶ 9} Assignment of Error No. 1:
 {¶ 10} "THE COURT ERRED IN DISTRIBUTING THE CDs INCONSISTENTLY."
 {¶ 11} In this assignment of error, Pamela argues that the probate court inconsistently distributed funds from several certificate of deposit accounts among Pamela, Stephen, and Christopher. According to Pamela, the probate court's distribution had "no rational basis" and was contrary to "fundamental fairness."
 {¶ 12} The probate court has exclusive jurisdiction to "order the distribution of estates[.]" R.C. 2101.24(A)(1)(c). We review a probate court's decision regarding such matters under an abuse of discretion standard. See In re Estate of Platt,148 Ohio App.3d 132, 2002-Ohio-3382, ¶ 13. As so often stated, an abuse of discretion connotes more than an error of law or judgment; it implies that the trial court's attitude was unreasonable, arbitrary, or unconscionable. In re Testamentary Trust of Hamm (1997), 124 Ohio App.3d 683, 689.
 {¶ 13} Pamela contests the probate court's distribution of funds originally in three CD accounts: two CD accounts at First National Bank of Lebanon numbered 4591 and 5022, and a CD account established at Provident Bank, the funds in which were eventually transferred by Pamela to a Skandia annuity account. CD account 4591 and CD account 5022 were both created by Randall prior to his death. CD account 4591 was created in August 1990 as a $100,000 joint and survivorship account in the names of Stephen or Marion. CD account 5022 was created in February 1991 as a $50,000 joint and survivorship account in the names of Christopher or Marion.
 {¶ 14} The Provident CD account was created in December 1993, after the death of Randall, but before the death of Marion, in the amount of $100,000. The account was a joint and survivorship account in the names of Pamela or Marion. According to Pamela, Stephen used his power of attorney over Marion to create the account, combining $50,000 from a joint and survivorship account previously created by Randall in the names of Pamela or Marion, with $50,000 from a payable-on-death account previously created by Randall for the benefit of Marion. Stephen could not recall creating the Provident CD account.
 {¶ 15} In its April 5, 1999 decision, the probate court found that Christopher was entitled to the $50,000 in joint and survivorship funds originally in CD account 5022. The court also found that Stephen was entitled to the $100,000 in joint and survivorship funds originally in CD account 4591. The record showed that Marion's guardian had used $40,000 from that CD account for Marion's personal care. However, the court found that "there were other non-survivorship funds in the Marion Lilley guardianship which should have been used first by the guardian for the expenses of the ward." Therefore, the court ordered Marion's estate to return $40,000 to Stephen.
 {¶ 16} In its August 2005 amended findings of fact and conclusions of law, the probate court clarified its previous orders regarding CD account 4591. The court reiterated that Stephen was entitled to the entire $100,000 of the funds originally in CD account 4591. Noting that Marion's guardian had withdrawn and invested the other $60,000 in a CD account created in Marion's name only, the court determined that Marion's estate was indebted to Stephen for the remaining $60,000, in addition to the $40,000.
 {¶ 17} In its February 2, 1999 decision, the probate court determined that Pamela was entitled to $50,000 of the $100,000 originally in the Provident CD account. In an entry clarifying that decision, the court determined that when Stephen combined the two CD accounts previously established by Randall and created the Provident CD account, he did not have the authority to do so. Therefore, the court found that Pamela was only entitled to $50,000, representing the funds in the joint and survivorship account previously created by Randall in the names of Marion or Pamela, and not the $50,000 Stephen withdrew from the payable-on-death account created by Randall for Marion.
 {¶ 18} Pamela asserts that the court's 1999 decisions, in which the court ruled that Marion's estate owed $40,000 to Stephen for CD account 4591, $50,000 to Christopher for CD account 5022, and $50,000 to her for the Provident CD account, were fairly balanced. However, Pamela argues that the court's August 2005 findings of fact and conclusions of law, in which the court further ordered Marion's estate to pay Stephen an additional $60,000, "destroy[ed] this balance."
 {¶ 19} Contrary to Pamela's assertions, it is apparent from the record that the probate court was not attempting to "balance" its distribution of the CDs. Rather, the court was merely granting to the parties what they were entitled to under the various joint and survivorship accounts. Therefore, the probate court's August 2005 decision did not "destroy" a balance in the distribution of the CDs, as Pamela argues. Even prior to the court's August 2005 decision, the CD distribution was not "balanced," as the court had ordered that Stephen receive $10,000 less than Pamela and Christopher. Accordingly, we will examine the propriety of the court's ruling that Stephen was entitled to the entire $100,000 originally in CD account 4591, the only ruling that Pamela specifically contests in her brief.
 {¶ 20} The appointment of a guardian for an incompetent ward does not terminate the survivorship nature of a joint and survivorship account of which the ward is a co-owner. See Miller v. Yocum (1970), 21 Ohio St.2d 162, 168; Bevins v. Cent. Trust Co., N.A. (Dec. 7, 1992), Butler Nos. CA92-02-034, CA92-03-042, CA92-03-043, and CA92-03-045, 1992 WL 357156, *2. If the funds in the joint and survivorship account are required to provide necessary support and maintenance for the ward, the guardian may apply to the probate court for an order permitting the guardian to use the funds. Miller at 168; Friedrich v. BancOhio Natl. Bank (1984), 14 Ohio App.3d 247, 251-252. The transfer of funds by a guardian from the ward's joint and survivorship account to other accounts does not alter the right of surviving co-owners to the balance of all remaining funds at the ward's death. See Guerra v. Guerra (P.C. 1970), 25 Ohio Misc. 1, 7-8.
 {¶ 21} We find no abuse of discretion by the probate court in ruling that Stephen was entitled to the $60,000 that remained of the funds originally in CD account 4591. The survivorship nature of the account was not terminated by Marion's incompetence and the appointment of a guardian for her. Miller at 168. Further, though Marion's guardian transferred the funds from the joint and survivorship account to different accounts, those funds retained their survivorship identity, and Stephen was entitled to any of the remaining funds at Marion's death. Guerra at 7-8. The record demonstrates that the guardian eventually placed the $60,000 in an annuity fund, which became part of Marion's estate at her death. Accordingly, the probate court did not abuse its discretion in determining that Stephen was entitled to the $60,000, the funds remaining from the original joint and survivorship account.
 {¶ 22} Further, in light of her role in the guardian's withdrawal of the entire $100,000 from CD account 4591, Pamela's argument that Stephen should not be entitled to the remaining $60,000 due to principles of "fundamental fairness" rings hollow. The probate court made a factual finding that, shortly prior to the maturity date of CD 4591, Pamela wrote a memo to Marion's guardian suggesting that the guardian ask First National Bank of Lebanon not to remind Stephen of the CD's maturity. In that memo, Pamela further suggested that the guardian redeem the CD as soon as it matured. The record shows that the guardian redeemed the CD on the day of its maturity, and placed all of the funds in accounts to which Stephen did not have access.[2] The record also indicates that notice of the CD's maturity was sent to the guardian, but does not indicate that notice was sent to Stephen. Accordingly, the record indicates that Pamela defied principles of "fundamental fairness" when she wrote to the guardian, suggesting that the guardian withdraw all of the funds in CD account 4591 before Stephen could be notified of the CD's maturity.
 {¶ 23} As to the other $40,000 withdrawn by Marion's guardian from CD account 4591 and spent for Marion's personal care, the court found, as previously stated, that "there were other non-survivorship funds in the Marion Lilley guardianship which should have been used first by the guardian for the expenses of the ward." Pamela does not challenge that finding regarding the actions of the guardian, and we see no error as to that finding in the record before us. Accordingly, based on our above analysis, we find no error in the probate court's decision that Stephen was entitled to the entire $100,000 originally in CD account 4591.
 {¶ 24} Based on the foregoing discussion, we overrule Pamela's first assignment of error. The record does not demonstrate that the probate court acted arbitrarily, unreasonably, or unconscionably in distributing the CDs. Specifically, the court did not err in determining that Marion's estate owed Stephen the entire $100,000 originally in CD account 4591.
 {¶ 25} Assignment of Error No. 2:
 {¶ 26} "THE COURT ERRED IN PERMITTING STEPHEN LILLEY TO RETAIN $49,000.00 IN CHECKS HE WROTE TO HIMSELF AND ORIGINALLY DESIGNATED AS "LOANS."
 {¶ 27} In this assignment of error, Pamela argues that the probate court erred in determining that checks written to Stephen in the amount of $49,000 were gifts, not loans, from Randall. According to Pamela, Stephen did not meet his burden of proving that the checks were inter vivos gifts.
 {¶ 28} An inter vivos gift is an immediate, voluntary, gratuitous, and irrevocable transfer of property to another by a donor who is competent to act. Yeary v. Yeary (May 22, 2000), Brown App. No. CA99-07-023, 2000 WL 665508, *3; Studniewski v. Krzyzanowski (1989), 65 Ohio App.3d 628, 632. The donee has the burden of proving an inter vivos gift by clear and convincing evidence. Golick v. Golick, Clermont App. Nos. CA99-05-040 and CA99-05-045, 2001-Ohio-8641, 2001 WL 1598290, *6; Smith v. Shafer (1993), 89 Ohio App.3d 181, 183.
 {¶ 29} While the existence of a family relationship ordinarily gives rise to the presumption of a gift, where a confidential or fiduciary relationship exists between the donor and the donee, there is suspicion that the donee may have exerted undue influence on the donor. See Brooks v. Peterson (April 10, 1998), Hamilton App. Nos. A-9602497 and C-970548, 1998 WL 165024, *4; Studniewski, 65 Ohio App.3d at 632. In such circumstances, the family gift presumption yields to a presumption that the transfer was a result of undue influence, and the party in the superior position must come forward with proof of the validity of the transfer. See In re Guardianship of Marshall (May 26, 1998), Butler App. No. CA96-11-239, 1998 WL 265010, *2. Nevertheless, the party contesting the gift retains the ultimate burden of proving undue influence by clear and convincing evidence. Smith,89 Ohio App.3d at 183; Studniewski at 632.
 {¶ 30} "The existence of an inter vivos gift is ordinarily a question of fact." Wheeler v. Martin, Washington App. No. 04CA15,2004-Ohio-6936, ¶ 16; Leon v. Caroselli (May 21, 1997), Hamilton App. Nos. C-960364 and C-960612, 1997 WL 266761, *2. As to questions of fact, we give deference to the trial court, which is best able to observe the witnesses and weigh the credibility of their testimony. See Owens v. Haunert (2000),137 Ohio App.3d 507, 514.
 {¶ 31} In his testimony, Stephen could recall virtually none of the details surrounding the checks, which were written over eight years prior to the hearing. However, the record clearly shows that the word "loan" was crossed out, and the word "gift" written in its place on the various check stubs. Stephen testified that all the handwriting on the check stubs was his own, and that he wrote the checks for Randall using his power of attorney. The record shows additional check stubs on which the same change was made, including several checks written to Christopher. On other check stubs, including stubs for checks written to Stephen, the word loan was not crossed out and replaced.
 {¶ 32} Due to the power of attorney granted to Stephen by Randall and the significant control Stephen exerted over Randall's financial affairs during the latter stages of Randall's life, it is apparent that a fiduciary relationship existed between Randall and Stephen. See In re Scott (1996),111 Ohio App.3d 273, 276. Accordingly, despite Stephen's familial connection to Randall, there was a presumption that the gift transfer was the product of undue influence. Guardianship of Marshall, 1998 WL 265010 at *2. Stephen, the party in the superior position, was required to come forward with some evidence rebutting the presumption. Id. at *2.
 {¶ 33} Stephen did come forward with evidence rebutting the presumption of undue influence, specifically the testimony of William Dunn, an accountant who worked for both Randall and Stephen for many years. Dunn testified that, to his recollection, he would have had the disputed checks available for his review when he prepared Randall's tax return for the year the checks were written. Dunn could not recall any conversations with Randall about the checks. However, according to Dunn, Randall never complained to him during the course of their long association that Stephen "was taking advantage of him in any way." Dunn also could not recall any conversations with Randall in which Randall was critical of Stephen's "business conduct." We additionally note the probate court's finding, after reviewing the evidence, that Randall was competent until he died, and that "there was no undue influence on Randall * * * from 1988 to the date of his death."
 {¶ 34} As discussed above, while there is a presumption of undue influence when an inter vivos gift is made in the context of a fiduciary relationship, the party challenging the gift ultimately has the burden to prove undue influence. Smith,89 Ohio App.3d at 183; Studniewski 65 Ohio App.3d at 632. Therefore, Pamela, who challenged the gift, ultimately had the burden of proving Stephen's undue influence over Randall.
 {¶ 35} The record does not indicate that Pamela met her burden of proving undue influence. The evidence in the record regarding the disputed checks offers only speculation of undue influence. While the record may show opportunity, the record does not show the actual or attempted exertion of undue influence, which is essential to a successful undue influence argument. See Ingle v. Ingle, Greene App. No. 2005-CA-110, 2006-Ohio-3749, ¶51, citing West v. Henry (1962), 173 Ohio St. 498, 501. The probate court, which was in the best position to observe the testimony of Dunn and Stephen regarding the disputed checks, did not find the presence of undue influence so as to defeat an apparent inter vivos gift. We find no basis to overturn the court's determination. Accordingly, we overrule Pamela's second assignment of error.
 {¶ 36} Assignment of Error No. 3:
 {¶ 37} "THE COURT ERRED BY IMPOSING INTEREST WITHOUT STATUTORY AUTHORITY."
 {¶ 38} In June 2001, the probate court issued a decision ruling that Stephen, Pamela, and Christopher owed ten percent interest on their obligations to Marion's estate. In this assignment of error, Pamela argues that the probate court erred in imposing interest on her obligations. Specifically, Pamela asserts that the probate court did not have statutory authority to impose interest.
 {¶ 39} In its June 2001 decision, the court imposed ten percent interest on the following obligations of Pamela to Marion's estate:
 {¶ 40} (1) $2,440.50 in personalty purchased by Pamela from Marion's estate;
 {¶ 41} (2) $903.93 in real estate taxes paid by Marion's estate; and
 {¶ 42} (3) the amount over $50,000 remaining in the Skandia account, less interest earned on the $50,000.
 {¶ 43} Further, in its April 2002 decision, the probate court ordered Pamela to pay ten percent interest on $16,000 she owed to Marion's estate, representing excess funds Pamela retained from a trust account in the name of Christopher Lilley, Jr.
 {¶ 44} R.C. Chapter 1343 governs the imposition of interest. R.C. 1343.03 governs the imposition of interest when not stipulated in writing. R.C. 1343.03 contains four subsections — (A), (B), (C), and (D). Subsections (B), (C), and (D) deal with judgments rendered in civil actions based on tortious conduct. Those subsections are clearly inapplicable to this case, which did not originate as a civil action based on tortious conduct. However, subsection (A) permits a court to impose interest "upon all judgments, decrees, and orders of any judicial tribunal for the payment of money arising out of tortious conduct or a contract or other transaction[.]" (Emphasis added).
 {¶ 45} According to Pamela, the probate court "acknowledged that no provision of R.C. 1343.03" authorized the imposition of interest. However, we find no such a statement in the court's decision. Rather, the court cited R.C. 1343.03(A) at the outset of its decision, and appears to have applied that section. Accordingly, we review the probate court's decision to order interest pursuant to R.C. 1343.03(A) under an abuse of discretion standard. See Dunbar v. Dunbar, 68 Ohio St.3d 369, 370,1994-Ohio-509.
 {¶ 46} In Estate of Wirebaugh (Aug. 9, 1991), Wood App. No. WD-90-18, 1991 WL 154060, the court of appeals applied the "contract or other transaction" language in R.C. 1343.03(A) to affirm a probate court's imposition of interest on the obligation of a decedent's son to the estate. The case arose from exceptions to the estate's inventory. The decedent's son had improperly withdrawn funds during the decedent's lifetime from joint and survivorship accounts shared by the decedent and his son, but in which the son did not have a lifetime interest. The court of appeals found that the son's obligation arose from a "contract (joint and survivorship accounts) or `other transactions,'" and therefore affirmed the imposition of interest pursuant to R.C.1343.03(A). Id. at *10.
 {¶ 47} Ruling on a cause of action that arose prior to the effective date of R.C. 1343.03, the Ohio Supreme Court similarly held that an order of interest on a debt to an estate was proper. Gillota v. Gillota (1983), 4 Ohio St. 3d 222, 225. In Gillota, the decedent's brother withdrew funds during the decedent's lifetime from a joint and survivorship account shared with the decedent, but in which the brother did not have a lifetime interest. The case arose from an action filed in probate court by the executrix seeking a declaration that the estate was entitled to the funds.
 {¶ 48} We find this case distinguishable from Wirebaugh and Gillota. The debts in Wirebaugh and Gillota arose from contractual violations, specifically, the violation of contracts underlying joint and survivorship bank accounts, and the resulting improper transactions. In this case, the debts owed by Pamela to Marion's estate were not the result of contractual violations, improper transactions, or tortious conduct. As to the Skandia funds, the court determined that Pamela owed Marion's estate not due to any improper action by her, but due to Stephen's lack of authority in transferring certain funds that eventually became part of the Skandia funds. The record also does not indicate any improper action by Pamela with respect to the personalty purchased from Marion's estate or the payment of certain real estate taxes by Marion.
 {¶ 49} With regard to the $16,000 from Christopher, Jr.'s trust account, the probate court, in its February 1999 decision, simply ordered Pamela to return the funds to Marion's estate. The court did not make a finding of tortious conversion, nor did it find that Pamela violated a contractual provision or engaged in an improper transaction. As Pamela asserts in her reply brief, the record indicates that the court was merely "sort[ing] out" the funds owed to the estate.
 {¶ 50} After reviewing the law and record, we find that the probate court lacked authority under R.C. 1343.03(A) to impose interest on Pamela's obligations to Marion's estate, and therefore abused its discretion. The orders of the probate court regarding Pamela's obligations did not arise out of Pamela's tortious conduct, nor did the orders arise out of Pamela's improper conduct with respect to a "contract or other transaction." Accordingly, we sustain Pamela's third assignment of error.
 {¶ 51} Cross-Assignment of Error No. 1:
 {¶ 52} "THE PROBATE COURT ABUSED ITS DISCRETION IN ITS FEBRUARY 5, 1999 AND APRIL 5, 1999 RULINGS WHEN IT REFUSED TO ORDER PAM LILLEY TO PAY AND REQUIRED STEPHEN LILLEY TO REIMBURSE THE ESTATE FOR ATTORNEY FEES INCURRED AS A RESULT OF DEFENDING THE INSTITUTION OF A GUARDIANSHIP PROCEEDING REGARDING MARION R. LILLEY IN FRANKLIN COUNTY, OHIO, THE WRONG VENUE."
 {¶ 53} In his cross-assignment of error, Stephen argues that the probate court erred in not ordering Pamela to pay his attorney fees incurred when contesting the filing of a guardianship application in Franklin County by Pamela. Related to that argument, Stephen asserts that the probate court should not have ordered him to reimburse Marion's estate for funds he used from Marion's guardianship to pay those fees.
 {¶ 54} In April 1994, Pamela filed an application for the appointment of a guardian for Marion in Franklin County Probate Court. At the time, Marion was suffering from Alzheimer's disease, and was living at an Alzheimer's care facility in Columbus. Though Marion had various personal items and two bank accounts in Columbus, she owned multiple properties in Warren County, including the home where she had lived for 55 years. Her furniture was still in that home, as were other personal items. She also had bank accounts in Warren County. It was the understanding of Stephen and Christopher that Marion was in the Columbus facility only until there was availability in the Otterbein-Lebanon retirement facility in Warren County. However, the record indicates that Pamela intended Marion's stay in Columbus to be permanent, and did not reveal that intention to Stephen or Christopher. The Franklin County Probate Court ultimately determined that venue was proper in Warren County, and transferred the case there.
 {¶ 55} Civ.R. 73(B) states that the venue requirements in Civ.R. 3(B) "shall not apply to the proceedings of the probate division of the court of common pleas, which shall be venued as provided by law." With respect to guardianship proceedings, the law provides that venue is proper in the county where the prospective ward (1) is a resident or (2) has legal settlement. In re Guardianship of Friend (Dec. 16, 1993), Cuyahoga App. No. 64018, 1993 WL 526643, *6; R.C. 2111.02(A).
 {¶ 56} With regard to attorney fees, Civ.R. 73(B) states as follows: "Proceedings that are improperly venued shall be transferred to a proper venue provided by law and division (B) of this rule, and the court may assess costs, including reasonable attorney fees, to the time of transfer against the party who commenced the action in an improper venue." Generally, a trial court has discretion in considering whether to impose attorney fees, and we will not reverse a decision regarding attorney fees absent an abuse of that discretion. Fowler v. Smith, Butler App. No. CA2003-02-042, 2003-Ohio-6257, ¶ 25, citing Motorists Mut. Ins. v. Brandenburg, 72 Ohio St.3d 157, 1995-Ohio-281.
 {¶ 57} We find no abuse of discretion by the Warren County Probate Court in refusing to impose attorney fees on Pamela for filing Marion's guardianship application in an improper venue. The Franklin County Probate Court ultimately determined that Marion's physical presence in Franklin County did not have the degree of permanence necessary to make her a "resident" or to have "legal settlement" there. However, Pamela's argument for venue in Franklin County was not baseless, even taking into account her undisclosed intention to have Marion remain in Columbus permanently. Marion was living in Columbus at the time Pamela filed the guardianship application, and had bank accounts and personal items there. After reviewing the record, we cannot say that the probate court's failure to impose attorney fees on Pamela was arbitrary, unreasonable, or unconscionable.
 {¶ 58} Similarly, we find no abuse of discretion by the probate court in ordering Stephen to reimburse Marion's estate for the attorney fees he incurred while contesting the Franklin County guardianship application. Stephen directs us to no authority supporting his assertion that his use of guardianship funds for the attorney fees was proper, or that the attorney fees were anything other than his personal obligation. Because we find no error by the probate court with regard to attorney fees, we overrule Stephen's cross-assignment of error.
 {¶ 59} Having overruled Pamela's first and second assignments of error, sustained her third assignment of error, and overruled Stephen's cross-assignment of error, we affirm in part, and reverse in part, the judgment of the probate court. We remand this case for further proceedings according to law and consistent with this opinion.
Walsh and Bressler, JJ., concur.
[1] Pamela filed her notice of appeal on August 8, 2005 at 11:16 a.m. The probate court issued its amended findings of fact and conclusions of law, and its decision and entry, on August 8, 2005 at 12:31 p.m. Nevertheless, Pamela's notice of appeal was valid as a premature notice of appeal under App.R. 4(C). Pursuant to that rule, Pamela filed her notice of appeal after the probate court had announced its decision in its July 11, 2005 findings of fact and conclusions of law, but before the court issued a judgment entry. See State v. Lovely. Warren CA2003-06-063,2004-Ohio-701, fn.2; Lands Fall, Inc. v. Wilson (Mar. 27, 1992), Lake App. No. 91-L-047, 1992 WL 86534, *1. We note that the only change effected by the court's August 8, 2005 amended findings of fact and conclusions of law was the removal of certain findings and conclusions from the July 11, 2005 findings of fact and conclusions of law that were not relevant to the issues appealed by Pamela.
[2] The guardian's withdrawal of all of the funds in CD account 4591 was $50,000 in excess of Marion's lifetime ownership rights in those funds. See Estate of Cowling v. Estate of Cowling.109 Ohio St.3d 276, 2006-Ohio-2418, ¶ 12 (discussing presumption of equal ownership among owners of joint and survivorship account during their lifetimes where net contributions to account not shown).