[Cite as *Williamson v. Williamson*, 2024-Ohio-1919.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

|  |  |  |
|---|---|---|
| PERLINA WILLIAMSON, | : | |
| Appellant, | : | CASE NO. CA2023-05-058 |
| | : | O P I N I O N<br>5/20/2024 |
| - vs - | : | |
| | : | |
| FREDDIE G. WILLIAMSON, | : | |
| Appellee. | : | |

APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
DOMESTIC RELATIONS DIVISION
Case No. DR2022-01-0052

Caparella-Kraemer & Associates, LLC, and Bradley M. Kraemer, for appellant.

Cordell | Cordell, and Danielle C. Kulik, for appellee.

**BYRNE, J.**

{¶ 1} Perlina Williamson appeals from a decree of divorce issued by the Butler County Court of Common Pleas, Domestic Relations Division. Specifically, Perlina appeals from the portion of that decree that categorized the parties' residence as marital property. For the reasons described below, we affirm.

## I. Factual and Procedural Background

{¶ 2} Perlina and Freddie G. Williamson married in 1982. This was a second

marriage for both of them. In 2022, Perlina filed for divorce.

{¶ 3} Prior to the final contested hearing, the parties entered into stipulations. Relevant to this appeal, the parties stipulated that their residential home, located at 765 Davis Drive, Monroe, Ohio ("the Monroe home") was acquired in 1997 and was deeded to Perlina's trust.[1] The parties agreed that the value of the home was $247,000 and that there was no mortgage associated with the home.

{¶ 4} However, the parties disputed whether the Monroe home was marital property. Freddie claimed that the Monroe home was marital property and Perlina claimed that the Monroe home was her separate property.

**A. The Contested Hearing**

{¶ 5} The matter proceeded to a contested hearing at which both Perlina and Freddie testified. The parties also introduced numerous exhibits. We will summarize the relevant evidence submitted, along with some specific testimony by the parties.

{¶ 6} When Perlina and Freddie married in 1982, they lived at Perlina's home located at 4404 Franklin Ave, in Norwood, Ohio ("the Norwood home"). An exhibit introduced at trial consisted of a deed and transfer records for the Norwood home. The transfer records indicate that Perlina acquired sole title to the home in 1977 when it was transferred to her pursuant to her prior divorce.

{¶ 7} In 1987 (five years after Perlina and Freddie married), the Norwood home was transferred from Perlina to Perlina's trust then in existence. (No copy of this trust was introduced at trial. We will refer to this trust as the "First Perlina Trust Agreement.") The deed transferring the home to the First Perlina Trust Agreement was signed by both

---

1. There are two trusts at issue in this case in which Perlina was a trustee. The differences between the two trusts are described below. The above reference is to the trust we will call the "Second Perlina Trust Agreement."

Perlina and Freddie.

{¶ 8} Perlina testified that both she and Freddie were working at the time they lived together at the Norwood home and that Freddie contributed to "some" expenses at the Norwood home, though she did not specify what expenses those were. She also stated that Freddie made "some" improvements to the Norwood home, which were that he bought a cabinet and sink for the home, which he installed himself.

{¶ 9} Perlina testified that in 1982, when she and Freddie married, the Norwood home had a mortgage with GEM Federal Credit Union. That mortgage was not paid off until sometime after she and Freddie married. No testimony or other evidence indicated the amount of the mortgage when Freddie moved into the Norwood home. Nor was there evidence submitted as to when the mortgage was paid off. No testimony or other evidence were introduced at trial relative to any payments made on this mortgage.

{¶ 10} Freddie confirmed that there was a mortgage on the Norwood home when he moved in. As far as his contribution to the monthly expenses, Freddie stated that he gave Perlina $100 in cash from his paycheck per week. Freddie admitted that he had no records of him paying any mortgage payments and testified that Perlina "did it all." Freddie stated that he believed that Perlina paid the mortgage payments out of the couple's joint account or Perlina's account. As to work he did at the Norwood home, Freddie stated that he "redid" the "garage roof" and the "basement," "did concrete work around the house," "put in a new kitchen," and "painted rooms and I cleaned the wallpaper off."

{¶ 11} In 1997, Perlina, as Trustee of the First Perlina Trust Agreement, sold the Norwood home. Perlina testified that she received $131,000 from the sale of the Norwood home, which she deposited into her personal account at Fifth Third Bank. Perlina testified that she and Freddie planned to buy their next property in both of their names. However,

Freddie lost his job around this time and could not obtain a mortgage. Perlina testified that she took the proceeds from the sale of the Norwood home and used those funds to pay for the Monroe home. Perlina testified that she and Freddie did not borrow any money to purchase the Monroe home and she did not recall ever having a mortgage on the Monroe home.

{¶ 12} Two exhibits relevant to the purchase of the Monroe home were introduced at trial.

{¶ 13} The first exhibit is a closing/settlement statement dated October 24, 1997. The document lists "Perlina Williamson, Trustee" as the "borrower." And it indicates that Perlina, as Trustee, paid a total of $121,193.00 to close on the home and that she paid $119,991.69 at closing.

{¶ 14} The second exhibit was a series of checks related to the closing, including a check dated October 24, 1997, made payable to Fifth Third Bank in the amount of $119,991.69. The check was drawn from Perlina's individual account held at Fifth Third Bank.

{¶ 15} Perlina also introduced a copy of the "Trust Agreement of Perlina Williamson," which was dated October 23, 1997 (one day before the purchase of the Monroe home). This document pertained to a second trust, distinct from the First Perlina Trust Agreement. We will refer to this second trust, executed on October 23, 1997, as the "Second Perlina Trust Agreement." The beneficiaries of the Second Perlina Trust Agreement are Perlina's four children from her first marriage.

{¶ 16} Section XI of the Second Perlina Trust Agreement states the following:

> Fred G. Williamson, (Disclaimant) who is the spouse of
> Grantor, has joined in the execution of this trust to disclaim
> any rights, which he would otherwise have by reason of being
> the spouse of Grantor, in any property in the trust. Disclaimant
> hereby specifically acknowledges that the funds used for the

- 4 -

purchase of 765 Davis Drive, Monroe, Ohio came solely from his wife, primarily from the sale of her house on _____Avenue, Norwood, Ohio and that he has no right or claim in the ownership of the Davis Drive property. By execution hereof Disclaimant disclaims any interest in the said Davis Drive real estate and specifically grants to the Trustee of this Trust a Limited Power of Attorney which is a power coupled with an interest and which shall be irrevocable, to execute, complete and file a full disclaimer of any interest in this trust property and Trustee hereof shall have full authority to take all and any steps as may be appropriate to disclaim any interest which may belong to Disclaimant in any property of this Trust. Disclaimant and successors does hereby agree to save and hold Grantor, this Trust and the beneficiaries of this Trust harmless from any claim of any kind but especially any claim of spousal rights by, through or under Disclaimant made against said Grantor, Trust or beneficiaries at any time and does hereby agree for himself and his heirs and successors to indemnify this Trust, the Grantor and beneficiaries thereof against any loss arising thereby including all costs and reasonable attorney fees to defend said claim.

{¶ 17} Freddie signed the Second Perlina Trust Agreement on the date of its execution and signed as "Disclaimant." Freddie testified that he never discussed the Second Perlina Trust Agreement with Perlina and thought it was "part of the will" that he signed, apparently referring to the last will and testament that Perlina executed on the same day as the execution of the Second Perlina Trust Agreement. However, on cross-examination, Freddie agreed that he knew at the time of the signing of the Second Perlina Trust Agreement that he was "disclaiming your interest in the property in the trust."

{¶ 18} Following the hearing, the parties submitted written closing arguments. Freddie argued that Section XI of the Second Perlina Trust Agreement was an invalid post-nuptial agreement.

**B. The Domestic Relations Court's Decision**

{¶ 19} The domestic relations court issued a written decision. With regard to the Monroe property, the court stated:

- 5 -

Wife makes claim the [Monroe home] is her separate property and asserts the purchase monies came from her separate interest in the [Norwood home]. She received the [Norwood home] in her divorce from first husband in 1977 and would have a separate interest in that home at the time of marriage. However, no tracing evidence was presented as to its value at time of marriage. Five years after the parties' marriage, the parties together transferred all interest in the [Norwood home] to Perlina [Williamson], Trustee. Evidence is clear that the parties together had interest in the [Norwood home] home in order to effectuate transfer. The [Norwood home] became a marital / mixed marital asset during the marriage. No tracing evidence was presented as to the value of the home at time of transfer in 1987, nor were the 1987 trust documents presented at trial. Then Wife, as Trustee, sold the [Norwood home] on October 2, 1997. Wife's trust in existence at the time of this transfer was not provided to the Court for review. Nevertheless, one day before purchase of the [Monroe home], Wife created the [Second Perlina Trust Agreement]. No documents were presented as to the corpus of this new trust. Wife took title to the [Monroe home] as Trustee. However, payment for the [Monroe home] was issued from Wife's individual Fifth Third Bank account x7243 held only as Perlina Williamson—not as trustee and by doing so funded her trust with marital asset(s) absent sufficient tracing of any separate interest.

Any non-marital interest Wife may have had in the [Norwood home] could not be traced with any certainty to find she held separate interest in [the Monroe home]. Evidence remains lacking as to what separate interest value Wife maintained in the [Norwood home] or its proceeds after marriage to Husband. Wife was not persuasive in her claim of a separate interest in the [Monroe home]. And as outlined above, Wife's use of the trust herein is tantamount to creating or offering to the Court a post-nuptial agreement, clearly invalid in Ohio.

The parties stipulated to the [Monroe home] value and the Court finds the fair market value of the [Monroe home] to be $247,000 and finds the home is marital property. Wife shall receive the [Monroe home] free and clear of any claim of Husband and shall hold him harmless subject to offset.

{¶ 20} The court subsequently issued a final decree of divorce, which awarded Perlina possession of the Monroe home and awarded Freddie half of the equity in the Monroe home. Perlina appealed and raised one assignment of error.

- 6 -

## II. Law and Analysis

{¶ 21} Perlina's assignment of error states:

THE TRIAL COURT ERRED IN NOT FINDING THAT THE [MONROE HOME] WAS APPELLANT'S SEPARATE PROPERTY.

{¶ 22} In support of her assignment of error, Perlina presents three "issues" for review.  First, Perlina argues that the court erred because she traced her separate property interest in the Monroe home and the court's decision was not supported by competent and credible evidence.  Second, Perlina contends that Section XI of the Second Perlina Trust Agreement was a valid postnuptial agreement that precluded a finding that the Monroe home was marital property.  Third, Perlina argues that the Monroe home is her separate property because Freddie gifted her his interest in the Monroe home by signing the Second Perlina Trust Agreement.

### A. Issue 1—Traceability of Perlina's Separate Property

{¶ 23} As stated above, Perlina argues that she traced her separate property interest in the Monroe home.

### 1. The Division of Property in a Divorce

{¶ 24} Property division in a divorce proceeding is a two-step process.  *Garcia v. Garcia Samano*, 12th Dist. Butler No. CA2018-05-094, 2019-Ohio-3223, ¶ 10, citing *Smith v. Smith*, 12th Dist. Clermont No. CA2016-08-059, 2017-Ohio-7463, ¶ 8.  In the first step, the domestic relations court must determine "what constitutes marital property and what constitutes separate property."  R.C. 3105.171(B).  The second step is not relevant to this appeal.[2]

---

2. In the second step of the process, the domestic relations court must equitably divide the marital property and separate property in accordance with R.C. 3105.171. *Smith* at ¶ 9; R.C. 3105.171(B).  Perlina has not challenged the equitable division of the Monroe home, and only challenges the finding that the Monroe home was marital property.

{¶ 25} We review the classification of property or debt as marital or separate under the manifest-weight-of-the-evidence standard and will not reverse a domestic relations court's classification if it is supported by competent and credible evidence. *Garcia* at ¶ 10; *Renz v. Renz*, 12th Dist. Clermont No. CA2010-05-034, 2011-Ohio-1634, ¶ 13.

{¶ 26} A statute defines "[m]arital property" to include the following:

> (i) All real and personal property that currently is owned by either or both of the spouses * * * and that was acquired by either or both of the spouses during the marriage;
>
> (ii) All interest that either or both of the spouses currently has in any real or personal property * * * and that was acquired by either or both of the spouses during the marriage;
>
> (iii) Except as otherwise provided in this section, all income and appreciation on separate property, due to the labor, monetary, or in-kind contribution of either or both of the spouses that occurred during the marriage; * * *.

R.C. 3105.171(A)(3)(a).

{¶ 27} The statute also provides that "'[m]arital property' does not include any separate property." R.C. 3105.171(A)(3)(b). "Separate property" includes:

> (ii) Any real or personal property or interest in real or personal property that was acquired by one spouse prior to the date of the marriage;
>
> (iii) Passive income and appreciation acquired from separate property by one spouse during the marriage * * *.

R.C. 3105.171(A)(6)(a).

**2. Law and Burden of Proof on Tracing Separate Property**

{¶ 28} "The commingling of separate property with other property of any type does not destroy the identity of the separate property as separate property, except when the separate property is not traceable." R.C. 3105.171(A)(6)(b). When one spouse contributes equity in the parties' marital home and that spouse can trace the equity to his or her premarital funds, those funds remain the spouse's separate property. *Bauer v.*

*Bauer*, 12th Dist. Warren Nos. CA2019-04-033 and CA2019-04-040, 2020-Ohio-425, ¶ 24. The party seeking to have a particular asset classified as separate property has the burden of proof, by a preponderance of evidence, to trace the asset to separate property. *Id*.

### 3. Analysis of Tracing Evidence

{¶ 29} Upon review, we find that competent and credible evidence supported the domestic relation court's decision that Perlina failed to meet her burden to trace her separate property to the Monroe home. There is no doubt that the Norwood home was Perlina's separate property at the time that Freddie moved in with her in 1982. However, there was no evidence submitted at trial concerning the value of the home in 1982, which might provide a baseline for Perlina's separate property interest in the Norwood home prior to her marriage to Freddie.

{¶ 30} Both parties testified that the Norwood home had a mortgage loan associated with it in 1982. No evidence was presented as to the amount of the mortgage in 1982. Both parties also agreed that mortgage was paid off after the marriage in 1982. But no evidence was submitted that would indicate when, specifically, that mortgage was paid off.

{¶ 31} Likewise, there was no evidence presented as to how the mortgage was paid down or who contributed to those payments. Freddie testified that he paid Perlina $100 weekly from his paycheck toward the couple's expenses and that Perlina handled the mortgage payment. He believed that she used their joint account or possibly her own personal account to pay the mortgage. There was no testimony from Perlina as to how she used Freddie's weekly contribution during this time period or what source of funds she used to pay down the mortgage on the Norwood home.

{¶ 32} Therefore, when Perlina, as Trustee of the First Perlina Trust Agreement,

sold the Norwood home and transferred the proceeds of that sale to her personal bank account, there was no way for the domestic relations court to determine with any degree of certainty what portion of the proceeds were traceable to funds that were marital and funds that were separate. The lack of evidence presented in this case as to the financial circumstances of the Norwood home justified the domestic relations court's decision that "[a]ny non-marital interest Wife may have had in the [Norwood home] could not be traced with any certainty to find she held separate interest in [the Monroe home]."

{¶ 33} In her brief, Perlina argues that the Norwood home was her separate property because "Appellee did not contribute to the mortgage of the [Norwood home]." For this proposition, Perlina cites to a portion of Freddie's testimony in which he agreed that he had no "record" of making a mortgage payment on the property. But this is a mischaracterization of Freddie's testimony. Freddie never claimed to make a mortgage payment on the Norwood home and was merely confirming that he had no records that would indicate that he made a mortgage payment. Instead, he testified that Perlina managed the mortgage payments and he separately contributed to the couple's joint expenses out of his paycheck. Regardless, it was Perlina's burden, not Freddie's, to trace her separate property interest to the purchase of the real estate obtained during the marriage. On this record, we cannot find that the domestic relations court's decision was unsupported by competent and credible evidence.

**B. Issue 2—Whether Section XI Constituted a Valid Post-Nuptial Agreement**

{¶ 34} Perlina argues that Section XI of the Second Perlina Trust Agreement, in which Freddie disclaimed any interest in the Monroe home, is a valid postnuptial agreement pursuant to R.C. 3103.06(A)(1) and R.C. 3103.061.

{¶ 35} R.C. 3103.06(A)(1) states that "A husband and wife may, by any contract with each other, do any of the following * * * Enter into a postnuptial agreement that alters

their legal relations with each other * * *."  R.C. 3103.06(B) provides that an agreement under the (A)(1) subsection shall comply with R.C. 3103.061.

{¶ 36}  R.C. 3103.061 provides:

Any agreement altering legal relations between spouses established under division (A)(1) of section 3103.05 or division (A)(1) or (2) of section 3103.06 of the Revised Code shall be valid and enforceable, with or without consideration, if all of the following apply:

(A) The agreement is in writing and signed by both spouses;

(B) The agreement is entered into freely without fraud, duress, coercion, or overreaching;

(C) There was full disclosure, or full knowledge, and understanding of the nature, value, and extent of the property of both spouses;

(D) The terms do not promote or encourage divorce or profiteering by divorce.

{¶ 37}  Perlina contends that Section XI of the Second Perlina Trust Agreement is a valid postnuptial agreement under these statutory provisions and presents arguments in support.

{¶ 38}  Freddie contends that Section XI is an invalid postnuptial agreement because at the time he signed the Second Perlina Trust Agreement, postnuptial agreements were unenforceable in Ohio.  We agree with Freddie.

{¶ 39}  Prior to an amendment effective March 23, 2023, the former version of R.C. 3103.06 provided:

A husband and wife cannot, by any contract with each other, alter their legal relations, except that they may agree to an immediate separation and make provisions for the support of either of them and their children during the separation.

{¶ 40}  Thus, prior to the March 23, 2023 modification to R.C. 3103.06, husbands and wives were precluded from entering into postnuptial contractual agreements

- 11 -

unaccompanied by a separation agreement. *Thompson v. Thompson*, 196 Ohio App.3d 764, 2011-Ohio-6286, ¶ 58 (10th Dist.); *King v. King*, 4th Dist. Adams No. 99 CA 680, 2000 WL 326131, *4 (Mar. 20, 2000).

{¶ 41} Perlina argues that this court should give the current version of R.C. 3103.06 retrospective effect to permit enforcement of Section XI of the Second Perlina Trust Agreement. However, the Revised Code provides that "[a] statute is presumed to be prospective in its operation unless expressly made retrospective." R.C. 1.48. Additionally, Section 28 of Article II of the Ohio Constitution prohibits the General Assembly from passing retroactive laws. Applying these two provisions, the Supreme Court of Ohio has established a two-part test to determine whether a statute may be applied retroactively. *State v. Gregoire*, 12th Dist. Butler No. CA2019-04-066, 2020-Ohio-415, ¶ 9, citing *State v. Consilio*, 114 Ohio St.3d 295, 2007-Ohio-4163, ¶ 10.

{¶ 42} Under this test, a court must first determine as a threshold matter whether the General Assembly expressly intended the statute to apply retroactively. *State v. Hubbard*, 12th Dist. Butler, 2020-Ohio-856, ¶ 22; *In re Fuel Adjustment Clauses for Columbus S. Power Co. & Ohio Power Co.*, 140 Ohio St.3d 352, 2014-Ohio-3764, ¶ 41. If not, the statute may not be applied retroactively. *Hubbard* at ¶ 22. However, if the General Assembly expressly indicated its intention that the statute apply retroactively, a court must move to the second step of the analysis and "determine whether the statute is remedial, in which case retroactive application is permitted, or substantive, in which case retroactive application is forbidden." *State v. White*, 132 Ohio St.3d 344, 2012-Ohio-2583, ¶ 27.

{¶ 43} There is no language in the current version of R.C. 3103.06 that would indicate an express intention by the legislature for the statute to apply retroactively. As such, the statute cannot be applied retroactively.

{¶ 44} Therefore, at the time the Second Perlina Trust Agreement was executed by Perlina and Freddie, R.C. 3103.06 prohibited husbands and wives from entering into postnuptial agreements unaccompanied by a contemporaneous separation agreement. *See Thompson*, 2011-Ohio-6286 at ¶ 58; *King*, 2000 WL 326131 at *4. There was no evidence presented indicating that the parties entered into a contemporaneous separation agreement at the time of the execution of the Second Perlina Trust Agreement. To the contrary, the parties remained married and living together for over two decades after the execution of the Second Perlina Trust Agreement. Accordingly, we do not find that Section XI precluded the domestic relations court from finding that Freddie maintained a marital interest in the Monroe home.

### C. Issue 3—Whether Freddie Gifted the Monroe Home to Perlina

{¶ 45} Perlina claims that Freddie gifted his interest in the Monroe home to her by signing the Second Perlina Trust Agreement as a disclaimant, which action constituted a gift of his marital interest in the home pursuant to R.C. 3105.171(A)(6)(a)(vii).

{¶ 46} R.C. 3105.171(A)(6)(a)(vii) states that separate property includes:

> Any gift of any real or personal property or of an interest in real or personal property that is made after the date of the marriage and that is proven by clear and convincing evidence to have been given to only one spouse.

{¶ 47} To establish an inter vivos gift, there must be evidence of the following essential elements, (1) intent of the donor to make an immediate gift, (2) delivery of the property to the donee, and (3) acceptance of the gift by the donee. *Sieber v. Sieber*, 12th Dist. Butler Nos. CA2014-05-106 and CA2014-05-114, 2015-Ohio-2315, ¶ 23; *Casper v. Casper*, 12th Dist. Warren Nos. CA2012-12-128 and CA2012-12-129, 2013-Ohio-4329, ¶ 12. The donee has the burden of proving an inter vivos gift by clear and convincing evidence. *In re Estate of Lilley*, 12th Dist. Warren Nos. CA2005-08-091, CA2005-08-092,

CA2005-08-095, and CA2005-08-096, 2006-Ohio-5510, ¶ 28.

{¶ 48} Clear and convincing evidence is

> that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.

*Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶ 49} The only purported evidence of a gift cited by Perlina in her appellate brief is the act of Freddie signing the Second Perlina Trust Agreement and therefore agreeing to the terms of Section XI. However, the language in Section XI is not consistent with Freddie making a gift. To the contrary, the language states that Freddie had no interest in the Monroe home that he could gift because "the funds used for the purchase of [the Monroe home] came solely from his wife, primarily from the sale of her house on _____Avenue, Norwood, Ohio."

{¶ 50} Other than the fact of Freddie's signing of the Second Perlina Trust Agreement, Perlina points to no other portion of the record purportedly constituting evidence of Freddie's intention to gift his interest in the Monroe home to Perlina. The record reflects Freddie testifying that he did not intend to "gift her that house" and Perlina did not testify to any other circumstances indicating that Freddie gifted her his interest in the Monroe home.

{¶ 51} Accordingly, we do not find that the record contains evidence that produces a firm conviction or belief that Freddie gifted his interest in the Monroe home to Perlina. *See Ledford* at paragraph three of the syllabus. Based on the foregoing analysis, we overrule Perlina's sole assignment of error.

### III. Conclusion

**{¶ 52}** Competent and credible evidence supported the trial court's conclusion that Perlina failed to meet her burden of tracing her separate property to the parties' residential home acquired during the marriage. The disclaimer provision in the Second Perlina Trust Agreement did not preclude the court from finding that Freddie maintained a marital interest in the Monroe home. There was no clear and convincing evidence presented that Freddie gifted his marital interest in the home to Perlina.

**{¶ 53}** Judgment affirmed.

S. POWELL, P.J., and HENDRICKSON, J., concur.