[Cite as *Vogel v. Campanaro*, 2021-Ohio-4245.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY


| | | |
|---|---|---|
| DAVID VOGEL, | : | |
| Appellant, | : | CASE NO. CA2020-07-036 |
| | : | O P I N I O N |
| - vs - | | 12/6/2021 |
| | : | |
| BEVERLY CAMPANARO, | : | |
| Appellee. | : | |


CIVIL APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
Case No. 18CV91138


Ronald J. Kozar, for appellant.

Jeffrey E. Richards, for appellee.


**HENDRICKSON, J.**

{¶1}  Appellant, David Vogel, both individually and as cotrustee of the Mardella C. Vogel Revocable Living Trust Dated July 1, 1994 (hereafter, "Brother"), appeals from the judgment entered in favor of appellee, Beverly Campanaro, both individually and as co-trustee of the Mardella C. Vogel Revocable Living Trust Dated July 1, 1994 (hereafter, "Sister"), following a bench trial on Brother's claims for breach of fiduciary duty, unjust enrichment, tortious interference with an inheritance, a request for an accounting, and

declarative relief. Brother challenges the trial court's findings that Sister did not use assets belonging to the parties' mother for Sister's own personal benefit and that Sister did not engage in self-serving transactions while in a fiduciary position. For the reasons set forth below, the judgment of the trial court is affirmed in part, reversed in part on jurisdictional grounds, and remanded.

## I. FACTUAL BACKGROUND

{¶2} Brother and Sister are the only children of their parents, Adam P. Vogel ("Father") and Mardella C. Vogel ("Mother"). In 1994, while Father and Mother were in their 70s, they each established individual revocable living trusts.[1] Mother's trust was titled the "Mardella C. Vogel Revocable Living Trust" (hereafter, "Mother's Trust"). The trust designated Mother as the initial trustee and primary beneficiary for her trust. Mother's Trust provided that the trustee could authorize signatories to make authorized expenditures from the trust's various financial accounts. The trust also provided that Mother, as settlor, could deplete the trust res during her lifetime or even revoke the trust. In the event that Mother died or ceased to serve as trustee, Father was designated as the alternate trustee. If Father predeceased Mother, then Brother and Sister were designated as cotrustees. Mother's Trust was originally funded with one dollar, but additional funds were later deposited into the checking account.[2]

{¶3} As Father and Mother aged, they required help with their day-to-day needs. This included assistance with transportation to doctor appointments and trips to various retail stores. As Sister was not employed outside the home, she assisted her parents

---

1. The use of Father's trust is not challenged in this appeal.

2. Furniture, furnishings, jewelry, household goods, and all other personal effects were later added to Mother's trust estate by an amendment. While other funds were added to Mother's trust, the record is silent as to the source of the funds and the amounts and dates the funds were deposited. The record does indicate, however, that when Mother's and Father's marital home – which had been transferred to Brother and Sister – was sold, Sister deposited her half of the sale proceeds, nearly $90,000, into Mother's trust checking account.

almost on a daily basis. In 2013, Father gave Sister possession of his 2009 Lexus RX vehicle ("Lexus") to use when transporting Mother or Father to their various appointments or when running errands with them. The title of the Lexus, however, remained in Father's name and he continued to pay for the vehicle's gas, insurance, and repairs.

{¶4} Mother paid all of her bills out of her trust checking account. In 2013, Sister began to help Mother manage her finances by writing checks for Mother using the same trust checking account to pay Mother's bills. According to Sister, Mother never lost her ability to handle her financial affairs; rather, Mother just lost the desire to do so after paying one of her bills twice. By the middle of 2015, Sister handled all financial matters for Mother. Sister testified that Mother's banks were made aware that Sister had authority to handle Mother's financial business. Sister continued to write checks on the trust bank account even after Mother's death in July of 2016.

{¶5} At some point in 2015, Father fell and sustained injuries, was hospitalized, and eventually placed in a nursing home. Both Brother and Sister agree that after Father was moved into a nursing home, around the beginning of August 2015, they had discussions with their parents about constructing an addition onto Sister's home so that Sister could take care of Mother and Father. Sister and Brother disagree as to whether their parents were in favor of the addition. Brother claims their parents were against the idea and Sister represented their parents were on board with it.

{¶6} Nonetheless, in mid-August, Sister signed a contract with a construction company for the construction of the addition at an original cost of $118,000. Unfortunately, on September 2, 2015, before the addition was completed, Father passed away.[3] Upon Father's death, Sister became the agent for Mother under Mother's 2014 Power of

---

3. Brother's lawsuit does not challenge assets that were in Father's name and were transferred to Mother pursuant to the terms of Father's will or his separate revocable living trust.

Attorney.[4]

{¶7} Following Father's death, Sister took the title to the Lexus to the bureau of motor vehicles and had the title transferred into Mother's name. Sister continued to pay Mother's bills using the trust checking account, which included writing checks and paying off credit card purchases totaling thousands of dollars. Sister also made monetary gifts on behalf of Mother directly to Brother and his children and indirectly to herself. In addition to using trust funds to pay for the addition to her home, Sister wrote a check for the purchase of a boat, alleging it was a gift from her parents.

{¶8} In a letter dated January 27, 2016, Mother resigned as the trustee of her revocable living trust. The resignation letter indicated that effective February 1, 2016, Brother and Sister would take over as cotrustees pursuant to the terms of Mother's Trust. Although he served as cotrustee, Brother admitted he never checked the trust's checking account transactions as he thought everything Sister was doing was proper. However, after Mother passed away on July 10, 2016, at age 98, Brother discovered Sister's purchase of the boat with funds from Mother's trust checking account. Brother became suspicious of Sister's actions and began to review the trust's records in detail. Upon discovering all of the credit card charges made during Mother's lifetime, Brother demanded an accounting of the trust's assets from Sister. Brother contends Sister failed to provide him with an accounting.

**A. Contested Transactions**

{¶9} Brother challenges Sister's actions in handling Mother's trust checking account and the various gifts Sister allegedly made to herself. Brother narrowed down the time period involving the questionable transactions from May 2015 to shortly after Mother's

---

4. Mother's 2014 Power of Attorney designated Father as her agent and Sister as the successor agent if Father was unable to serve in that position.

death on July 10, 2016. Although Brother initially questioned a wide variety of transactions involving Sister's use of Mother's trust and non-trust assets, at the end of the trial he agreed to stipulate that there were four main areas of contention, namely: (1) the use of Mother's trust money for the construction of the addition to Sister's home; (2) questionable purchases made with Mother's credit cards at numerous retail stores that were ultimately paid for with money from Mother's trust checking account; (3) use of Mother's trust money for the purchase of a boat for Sister; and (4) the transfer of Mother's Lexus by Sister to herself as an alleged inter vivos gift after Mother's death.

### 1. The Addition to Sister's Home

{¶10} In August 2015, Sister signed a "Project Proposal" with a construction company for the construction of an addition onto her home. Pursuant to the terms of the Project Proposal, Sister was required to pay $118,000 for the addition, with the cost being paid in five installments. The first installment of $20,000 was due upon signing the agreement. The next three installments of $25,000 each were due when certain phases of the construction were completed, and the final installment of $23,000 was due upon completion of the project.

{¶11} During construction, the original scope of the addition was expanded to include certain improvements. Some of the upgrades included adding a generator, heating, a day room, a deck, fencing, grass, and landscaping for the addition and having new downspouts added for the entire home. With the additional work and improvements, the final amount paid for the construction project was around $166,000 – though Brother disputes this figure and contends the real cost was $194,519.59. Brother also argued below that Sister benefited from the addition, due to the increase in value it added to her property. He presented Warren County Auditor records showing that Sister's property was valued at $231,610 in 2015 prior to the addition being added. By 2018, Sister's property value had

increased to $310,010. Once the addition was completed, Mother lived in the addition for nearly six months before her death in July 2016.

## 2. Credit Card Purchases

{¶12} Mother's Chase Freedom credit card was used to purchase a wide variety of items from numerous retail stores, including Kroger (groceries, fuel, and prescriptions), Kohl's, Dillard's, and Macy's, with purchases totaling over $53,000. Some of the purchases were signed for by Mother (which Brother claims was not her signature), while other purchases were signed for by Sister. At trial, Brother presented Exhibits 14 thru 18, summarized below, which detailed the itemized purchases in question.

> Exhibit 14     05/01/2015 thru 09/10/2015     $19,377.70[5]
> Compilation from Chase Freedom Account 2015
>
> Exhibit 15     01/01/2016 thru 08/04/2016     $14,104.82
> Compilation from Chase Freedom Account 2016
>
> Exhibit 16     06/16/2015 thru 03/04/2016     $8,739.39
> Compilation and Receipts from Nordstrom, Dillard's, and Macy's
>
> Exhibit 17     05/05/2015 thru 07/06/2016     $9,504.87
> Compilation from Chase Freedom Kroger 2015-2016
>
> Exhibit 18     05/16/2015 thru 07/12/2016     $1,737.42
> Compilation from Chase Freedom Fuel 2015-2016

{¶13} Sister admitted to using Mother's credit card for her own personal purchases on one or two occasions, but otherwise denied that the credit card purchases were for her benefit. Sister asserted Mother told her what to buy on Mother's behalf, and Sister used the credit card to purchase those items. Sister further claimed that the fuel purchased on the credit card was used to transport Mother to various stores, to Mother's doctor appointments, and to run Mother on her personal errands.

---

5. Exhibit 14 reflects a total balance of $19,379.70. However, there was a subtraction error on the exhibit, and once a credit is properly accounted for, the actual balance is $19,377.70.

### 3. Boat Purchase

{¶14} Brother also challenges Sister's May 2016 issuance of a check from the trust checking account to Caesar's Creek Marina in the sum of $18,000. The money was used to purchase a boat, which was titled in Sister's husband's name. Sister also used the trust checking account to pay for miscellaneous expenses, such as a boat slip and towing package for the Lexus. The boat was sold about a year after its purchase and Sister's husband kept the proceeds.

### 4. Transfer of the Lexus

{¶15} In 2013, Sister wrecked her personal car. Father permitted sister to drive the Lexus, which was titled in Father's name, when she drove Father and Mother to various appointments and destinations. Sister claims that after Father's death, Mother told Sister to put the title to the Lexus in her own name. Sister declined to do so, indicating that she wanted the vehicle to be in Mother's name until Mother passed away and then she would put it in her own name. Ten days after Mother died, Sister took the Lexus title and Mother's will to the Bureau of Motor Vehicles' Title Office and had the title transferred solely to herself. Sister did so despite a provision in Mother's will which provided that "personal automobiles," along with other designated items, be given to both Brother and Sister. Neither Brother nor the attorney representing Mother's estate were involved in the transfer. The final accounting in Mother's estate, signed by both parties as co-executors, did not account for the Lexus titled in Mother's name. Brother believed the value of the Lexus was $18,000 and represented that he did not receive an equivalent distribution for the asset.[6]

---

6. At trial, Brother testified that he and Sister entered into a verbal agreement that Sister would pay Brother from her inheritance an amount equal to the sums she received for the addition, boat, and Lexus. The trial court found that Brother failed to establish a binding contract and Brother does not challenge this finding on appeal.

## B. Brother's Lawsuit

{¶16} In May 2018, Brother filed a complaint in common pleas court against Sister alleging breach of fiduciary duties, a request for declaratory judgment of the ownership of Mother's property, unjust enrichment, intentional interference with the expectancy of an inheritance, and a demand for an accounting of Mother's Trust. In June 2019, Brother moved for summary judgment on his claims, but his motion was denied.

{¶17} The matter proceeded to a two-day bench trial before a magistrate in October 2019. Brother called two witnesses to the stand in his case-in-chief, namely Sister as if on cross-examination and himself. Brother also submitted 25 exhibits into evidence. One of the exhibits was the transcript of Sister's deposition, which had been taken during discovery. Sister then testified in her own defense and introduced into evidence an exhibit consisting of various financial documents relating to Mother's and Father's assets.

{¶18} At the conclusion of trial, the magistrate instructed the parties to submit closing arguments and memoranda on the specific issue of defeasance by the settlor of the trust. After receiving the requested documents, the magistrate rendered a written opinion finding that there was no evidence that Sister committed acts of self-dealing in using trust monies because Sister acted at the direction of Mother, who, as the settlor of the trust, retained complete control over trust assets. This was evidenced by the language in the trust that "the rights of the beneficiaries are subject to the control of the settlor, and the duties of the trustee * * * are owed exclusively to the settlor" along with the provisions of the trust that reserve a right to Mother, as the settlor, to "withdraw all or any part of the principal of the Trust Estate for any purpose or reason whatsoever." The magistrate noted that "any persons holding a beneficial interest in the Trust estate hold that interest 'subject to complete defeasance.'" Further, the magistrate pointed out that Brother did not cite "any legal authority for the proposition that any right retained by Mother to defease the Trust

cannot, as a matter of law, be delegated to another by an appointment such as a power of attorney."

{¶19} The magistrate addressed Brother's purported hearsay objection to certain statements Sister testified that Father and Mother made regarding the gifts Sister received. The magistrate allowed the statements to come in, noting that neither party made a hearsay objection during trial and the hearsay objection Brother made during closing arguments was untimely. The magistrate concluded that Sister "successfully rebutted, by a preponderance of the evidence, a presumption that she has engaged in unilateral self-dealing, fraud, concealment, or has otherwise committed a breach of trust or of her power of attorney." In addition, the magistrate found Sister "demonstrated that her parents meant to gift her with the Lexus, which was not a Trust asset."

{¶20} Brother filed timely objections to the magistrate's decision. In preparing his objections and reviewing the transcript, Brother discovered that the first 26 minutes of the second day of trial was missing as the court's recording system had malfunctioned. It is during this portion of trial, when Sister was testifying on direct in her case-in-chief, that Brother asserts his attorney made an ongoing hearsay objection to Sister testifying as to statements Father and Mother made to her regarding the alleged gifts. In Brother's 11 objections to the magistrate's decision, he argues the magistrate erred by (1) failing to treat Sister as a de facto trustee of Mother's trust; (2) failing to recognize Father and Mother lacked the capacity to handle their affairs since 2015; (3) finding that Sister rebutted the presumption that she engaged in self-dealing, fraud, concealment, or any other breach of duty; (4) improperly placing the burden on Brother to prove Mother consented to Sister's spending down of the trust assets; (5) misapplying case law and holding Mother could "delegate" the power to divest the trust to Sister; (6) finding that Sister did not breach her fiduciary duty in administering the trust; (7) allowing Sister to conceal the Lexus from the

trust; (8) allowing Sister to use trust assets to renovate her personal residence; (9) failing to find Sister misspent almost $90,000 of trust assets in improper credit card expenditures and other expenditures; (10) finding Sister had provided an "accounting;" and (11) failing to find Sister liable for tortious interference with inheritance and unjust enrichment and for not ordering a constructive trust or other remedies regarding the assets in this case.

{¶21} The trial court overruled Brother's objections and adopted the magistrate's decision in full. In doing so, the court addressed Brother's claim that his attorney made ongoing objections to Sister's hearsay statements as to Mother's intent to make gifts during the 26 minutes of unrecorded proceedings. The trial court noted that the magistrate had specifically found that "no objection to these [hearsay] statements was made. Defense counsel agrees." The trial court concluded that "the hearsay statements were properly admitted and were given the appropriate weight by the Magistrate in making her decision and by the Court in [its] decision." The trial court further concluded that Sister's testimony was "more credible" than Brother's testimony and upheld the magistrate's decision entering judgment for Sister on all of Brother's causes of actions.

## II. ANALYSIS

{¶22} Brother now appeals the trial court decision, raising the following as his sole assignment of error:

{¶23} THE TRIAL COURT ERRED BY ENTERING JUDGMENT FOR [SISTER] AND BY FAILING TO ENTER JUDGMENT FOR [BROTHER].

{¶24} Brother argues that Sister lacked the proper authority to use Mother's trust assets for her own personal, self-serving benefit and to transfer the Lexus into her name after Mother's death. Brother contends Sister had limited power to act under Mother's power of attorney and, even if Sister did have the legal authority to act, the trial court erred by admitting Sister's hearsay statements as to Mother's donative intent over his objections.

In addressing these issues, Brother asserts four arguments: (1) Sister's testimony that Mother wanted her to make certain gifts was inadmissible hearsay; (2) Sister lacked the power to make self-dealing transfers; (3) the trial court's decision was against the manifest weight of the evidence; and (4) Sister's transfer of the Lexus was not a valid gift. We now address each argument in turn.

## A. Inadmissible Hearsay Statements

{¶25} "Hearsay" is a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Hearsay is generally inadmissible unless it falls under one of the enumerated exceptions in the rules of evidence. Evid.R. 802.

{¶26} Brother contends that, as a matter of law, the trial court should have sustained his objections to Sister's testimony regarding statements of Mother's intent to make gifts during Mother's lifetime. Brother relies on Evid.R. 804(B)(5) to support his claim that the statements by Mother do not fall within the hearsay exceptions involving an unavailable declarant.

{¶27} As an initial matter, we note that both the magistrate and the trial court found that Brother failed to timely object to Sister's testimony on the grounds it constituted inadmissible hearsay. In the magistrate's decision, which was subsequently adopted by the trial court, the magistrate noted:

> During the trial, neither party objected to the introduction of [Mother's] or [Father's] statements. In closing argument, for the first time, [Brother] urges that this testimony is not admissible because it is hearsay and not subject to an exception. *This Magistrate concludes that the objection is waived at this point, not least because the opposing party has had no opportunity to respond to the objection. The evidence stays in, and this Magistrate will accord it an appropriate weight.*

(Emphasis added). The trial court, in turn, stated in its decision overruling Brother's

objections that "Defense counsel agree[d]" that no objections had been made to the hearsay statements.

{¶28} Brother argues the magistrate's and trial court's finding that he did not object to the hearsay statements is inaccurate. He contends that he made an ongoing objection to the hearsay statements during the 26-minute lapse in the recording on the second day of trial, while Sister testified during direct examination in her defense. Assuming that he did object, Brother argues the trial court had a duty when ruling on his objections to the magistrate's decision to review the evidence "afresh." Because the lapse in the recording hindered the court's ability to do so, Brother asserts the trial court should have reopened the proceedings in accordance with Civ.R. 53(D)(4)(b).

{¶29} Civ.R. 53(D)(3)(b)(iii) sets forth the procedure for objecting to a magistrate's factual finding and provides a remedy for when a transcript is unavailable:

> An objection to a factual finding, *whether or not specifically designated as a finding of fact* under Civ.R. 53(D)(3)(a)(ii), shall be supported by a transcript of all the evidence submitted to the magistrate relevant to that finding *or an affidavit of that evidence if a transcript is not available*. With leave of court, alternative technology or manner of reviewing the relevant evidence may be considered. The objecting party shall file the transcript or affidavit with the court within thirty days after filing objections unless the court extends the time in writing for preparation of the transcript or other good cause. If a party files timely objections prior to the date on which a transcript is prepared, the party may seek leave of court to supplement the objections.

(Emphasis added.)

{¶30} "'[A]lthough a trial court is required to undertake an independent review when ruling on objections pursuant to Civ.R. 53, absent a transcript or appropriate affidavit as provided in the rule, a trial court is limited to examination of the [magistrate's] conclusions of law and recommendations, in light of the accompanying findings of fact only unless the trial court elects to hold further hearings.'" *Manninen v. Alverez*, 12th Dist. Butler No.

CA2013-06-106, 2014-Ohio-75, ¶ 21, quoting *In re Estate of Haas*, 10th Dist. Franklin No. 07AP-512, 2007-Ohio-7011, ¶ 23. Further, the "failure to file a transcript or affidavit with the objections to a magistrate's findings of fact constitute[s] a waiver of appeal of those findings." *State ex rel. Pallone v. Ohio Court of Claims*, 143 Ohio St.3d 493, 2015-Ohio-2003, ¶ 13.

{¶31} The magistrate made a specific finding of fact that Brother had not objected to the out-of-court statements allegedly made by Mother until his closing arguments. If Brother disagreed with this specific finding of fact, it was incumbent upon Brother to make an objection and provide the trial court with an affidavit detailing the evidence and events that transpired during the 26-minute lapse in the recording. As Brother failed to file an affidavit, the trial court was entitled to rely on the magistrate's recollection and factual findings of what had transpired. The trial court was not required to reopen proceedings but, rather, was required to "undertake an independent review as to the objected matters to ascertain that the magistrate has properly determined the factual issues and appropriately applied the law." Civ.R. 53(D)(4)(d). The trial court did so in this case.

{¶32} The procedural issue presented in this case is similar to the one raised in *Dague v. Dague*, 11th Dist. Lake No. 2011-L-076, 2012-Ohio-1582. There, the appellant claimed his due process rights were violated "because of a malfunction in the tape recording of the magistrate's hearing." *Id.* at ¶ 1. The appellant suggested his due process rights had been violated as "the trial court could not engage in a complete review of the hearing before the Magistrate and Magistrate's decision as a result of the tape-recorder malfunction." *Id.* at ¶ 48. The Eleventh District Court of Appeals rejected the appellant's argument, finding, as the trial court did, that the appellant had "the opportunity to submit an affidavit of the evidence not recorded pursuant to Civ.R. 53(D)(3)(b)(iii)." *Id.* at ¶ 49. The court noted that if the appellant "felt that important evidence had been lost due to the malfunction, he was

obligated to bring that evidence to the court's attention via an affidavit. He failed to do so." *Id.* at ¶ 50. As a result, the Eleventh District determined there was "no violation of [the appellant's] due process rights." *Id.* at ¶ 49.

{¶33} Given Brother's failure to timely raise a hearsay objection to Sister's testimony of Mother's donative intent, we review the admission of such evidence under a plain error standard of review. *In re J.J.*, 12th Dist. Butler No. CA2005-12-525, 2006-Ohio-2999, ¶ 8 ("Failing to draw the trial court's attention to a possible error, by objection or otherwise, where the error could have been corrected, results in waiver of the issues for purposes of appeal, unless we find plain error"); *Pallone*, 2015-Ohio-2003, ¶ 11 (noting that where a party fails to follow the procedures set forth in Civ.R. 53[D][3][b][iii] for objecting to a magistrate's findings by failing to provide a transcript or affidavit, "that party waives any appeal as to those findings other than claims of plain error"). The plain error doctrine in civil cases applies only in "those extremely rare cases where exceptional circumstances require its application to prevent a manifest miscarriage of justice, and where the error complained of, if left uncorrected, would have a material adverse effect on the character of, and public confidence in, judicial proceedings." *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 121 (1997), citing *Schade v. Carnegie Body Co.*, 70 Ohio St.2d 207, 209 (1982).

{¶34} We find no error, plain or otherwise, in the admission of Sister's testimony regarding Mother's donative intent. The testimony Brother argues was inadmissible hearsay was properly admitted by the trial court as an exception to the hearsay rule under Evid.R. 803(3). This rule provides that regardless of whether the declarant is available as a witness,

> [a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution,

revocation, identification, or terms of declarant's will.

{¶35} A declarant's statement of donative intent, at the time of delivery of the property to the donee, is a statement indicative of a then existing state of mind or intent and is admissible pursuant to Evid. R. 803(3). *Richards v. Wasylyshyn*, 6th Dist. Lucas No. L-11-1037, 2012-Ohio-3733, ¶ 22, *See also McGrew v. Popham*, 5th Dist. Licking No. 05 CA 129, 2007-Ohio-428, ¶ 30 (court found that a decedent's statement regarding her intent to transfer property was admissible under Evid.R. 803[3]). To fall under the Evid.R. 803(3) exception, the statement cannot include an explanation as to why the declarant was of that condition. *In re Estate of Beverly*, 3d Dist. Seneca Nos. 13-12-28 and 13-12-29, 2013-Ohio-1498, ¶ 20. Here, Sister's testimony regarding Mother's statements involved Mother's then existing state of mind and her intent or plan to make specific donative transactions. Thus, the testimony from Sister regarding Father's and Mother's statements fell within the province of the Evid. R. 803(3) hearsay exception and was properly admissible.

{¶36} However, there were several times Sister provided improper explanations as to why her parents made gifts to her when being deposed and when testifying at trial. For instance, in Sister's May 16, 2019 deposition, Sister testified that her parents wanted to give her $20,000 for what she had been doing for Mother. This money was used to purchase the boat and to obtain various miscellaneous items for the boat's use. At trial, Sister testified that Father and Mother agreed to give her and her husband the same $20,000 to cover the expenses to "run" Mother's addition. As to the Lexus, Sister stated at trial that Mother gave her the car to keep and told Sister she could transfer the car into her name. Sister also testified that, pursuant to multiple discussions she had with her parents about building an addition onto her home as a place for her parents to live, there was a verbal agreement between them that the parents would pay for the addition in exchange for Sister taking care of Mother.

{¶37} Like the other hearsay statements made by Sister, Brother did not object to any of the explanations Sister provided as to why her parents gave her money for the addition or boat or gifted her the Lexus. As set forth above, Brother has waived all but plain error. Under the factual and procedural posture of this case, we do not find that this is one of "those extremely rare cases where exceptional circumstances require its application to prevent a manifest miscarriage of justice, and where the error complained of, if left uncorrected, would have a material adverse effect on the character of, and public confidence in, judicial proceedings." *Goldfuss*, 79 Ohio St.3d at 121. The magistrate properly considered Father's and Mother's donative intent and accorded it the appropriate weight. More importantly, the magistrate found Sister to be more credible. Therefore, Brother's claim that the trial court erred as a matter of law by allowing the admission of these hearsay statements through Sister's testimony is hereby overruled.

## B. Legal Power for Self-Serving Transfers

{¶38} Brother also argues that Sister lacked any legal authority to make the gifts he deems were self-serving transfers. Although Brother focuses solely on the authority given to Sister under Mother's 2014 power of attorney, there is another relevant legal document that comes into play, namely Mother's Trust. Between both of these legal documents, Sister had the authority to make the alleged self-serving transfers being challenged by Brother from May of 2015 to shortly after Mother's death on July 10, 2016.

## 1. Prior to Becoming Mother's Attorney-in-Fact

{¶39} From May 1, 2015 (the beginning of the time-period challenged by Brother), to September 1, 2015 (the day before Father passed away), Sister did not serve as trustee of Mother's Trust and the conditions had not yet been met for her to serve as Mother's contingent power of attorney. Therefore, the only way Sister could have acted on Mother's behalf during this time frame is either under the general principles of a fiduciary or, as

discussed below, as a signatory under Mother's Trust.

{¶40} Neither party disputes that at all relevant times Sister served as a fiduciary in some capacity for Mother. A fiduciary is defined as "a person having a duty, created by his undertaking, to act primarily for the benefit of another in matters connected with his undertaking." *Groob v. KeyBank*, 108 Ohio St.3d 348, 2006-Ohio-1189, ¶ 16. The record amply demonstrates that Sister undertook an informal fiduciary relationship with Mother in 2013, when she began to assist Mother in paying her bills from the trust checking account, and it continued until she was legally a signatory on Mother's trust checking account.

{¶41} Section 3-402 of the Uniform Commercial Code, codified in R.C. 1303.42, addresses this type of relationship. It provides, in relevant part, as follows:

> If a representative signs the name of the representative as drawer of a check without indication of the representative status and the check is payable from an account of the represented person who is identified on the check, the signer is not liable on the check if the signature is an *authorized signature of the represented person*.

(Emphasis added.)

{¶42} The checks produced and admitted by Brother at trial are contained in Plaintiff's Exhibits 7, 11, 12, and 13. The printing on the checks for the trust checking account contain two different versions for the name of the drawer. One version states the following as the drawer:

> MARDELA C. VOGEL REVOC LIV TRUST
> MARDELA C. VOGEL TTEE

The other version states:

> MARDELA C. VOGEL REVOC LIV TRUST
> BEVERLY CAMPANARO

In the latter version, Sister signed her name individually on the checks, without any representative designation, i.e., merely as "Beverly J. Campanaro."

{¶43} Under the facts of this case, the represented person on the checks is Mother's trust. The representative is Sister, who signed each check without indicating her representative status as either signatory, agent, or trustee. As R.C. 1303.42(C) indicates, Sister, as the signer, "is not liable on the check if the signature is an authorized signature of the represented person." Therefore, the issue to be determined is whether Sister's signature was an authorized signature on Mother's trust checking account.

{¶44} With respect to the contested transactions raised by Brother, the only transactions that occurred from May 1, 2015 to September 1, 2015 are credit card purchases paid off by checks written on the trust checking account totaling $2,708.81 and the $20,000 down payment made on the home-addition construction project. To determine if Sister's signature was, in fact, an authorized signature of Mother, the trial court was required to assess the credibility of the witnesses and weigh the evidence admitted at trial. This determination will be treated below, in addressing Brother's challenge to the manifest weight of the evidence.

**2. Mother's Power of Attorney**

{¶45} Brother contends that Sister lacked the power to make gifts to herself under the scope of authority given to her as the attorney-in-fact under Mother's power of attorney. According to Brother, since the power of attorney did not expressly authorize Mother's agent to make gifts, all gifts made by Sister to herself were improper.

{¶46} Mother's power of attorney designated Father as her primary agent and Sister as the successor agent. Section 5 of Mother's power of attorney, titled "Designation of Successor Agent," provides that if Father is "unable or unwilling to act" as Mother's agent then Sister will replace him as the successor agent. Based upon the language contained in Mother's power of attorney, Sister automatically became the successor agent when Father passed away on September 2, 2015.

{¶47} The power of attorney gave Sister very broad, general authority to conduct financial affairs on Mother's behalf. However, it also contained provisions limiting the authority granted to the agent. For instance, as to the agent's authority to make gifts, the power of attorney provided as follows:

> Section 2: Actions Requiring Express Authority.
>
> Unless expressly authorized and initialized by me in the *Special Instructions*, this power of attorney does not grant authority to my agent to do any of the following:
>
> * * *
>
> (c) Make a gift;

{¶48} The "Special Instructions" portion in Section 8 of the power of attorney was left blank. Therefore, there was no express authority to make gifts by the agent pursuant to Sections 2 and 8 of Mother's power of attorney. Sister does not dispute this. As the magistrate noted, "[Sister] testified that she did not act pursuant to the Power of Attorney, nor pursuant to her powers as Co-Trustee, except insofar as she had [Mother's] direction or authority to do so."

{¶49} Brother asserts that, as a matter of law, Sister did not have authority under the power of attorney "to make gifts to herself," regardless of whether Mother wanted her to do so. In support of his position, Brother relies upon our decision in *Rasnick v. Lenos*, 12th Dist. Butler No. CA2004-02-033, 2005-Ohio-2916. In *Rasnick*, a son, acting as agent under his father's power of attorney, closed out bank accounts held in father's name and transferred the money into accounts held in son's own name prior to Father's death. *Id.* at ¶ 12-15. The son tried to argue that the transfers were an inter vivos gift from his father. The trial court rejected the son's arguments and we affirmed, noting that

> [a] general durable power of attorney does not authorize attorneys-in-fact to transfer the principal's property to themselves or to others, unless the power of attorney explicitly

confers this power. An attorney-in-fact may not make gratuitous transfers of the principal's assets unless the power of attorney from which the authority is derived expressly and unambiguously grants the authority to do so.

*Id.* at ¶ 20, quoting *MacEwen v. Jordan*, 1st Dist. Hamilton No. C-020431, 2003-Ohio-1547, ¶ 12.

**{¶50}** Mother's power of attorney only granted her agent or successor agent "general authority to act for me with respect to the following subjects as defined by the Uniform Power of Attorney Act." Mother's power of attorney identified 13 subjects, such as real property, tangible personal property, stocks and bonds, commodities and options, banks and other financial institutions, over which the agent had authority to act. Brother is correct that Mother's power of attorney was general in nature and because it did not explicitly confer the power to make gifts, Sister lacked authorization under this instrument to do so.

**{¶51}** However, this restriction only applied to Sister in her role as an agent. Sister, on her own accord, could not independently decide to make any gift she desired under the provisions of the power of attorney. Yet, there were other provisions in Mother's power of attorney that, when used in connection with the terms of Mother's Trust, permitted Sister to make gifts *at Mother's direction*. Section 6 of Mother's Power of Attorney, entitled "Grant of General Authority," provided:

> I grant my agent and any successor agent general authority to act for me with the respect to the following subjects as defined in the Uniform Power of Attorney Act (sections 1337.21 to 1337.64 of the Ohio Revised Code):
>
> * * *
>
> (h) Estates, Trusts, and Other Beneficial Interests.

R.C. 1337.52, entitled "General authority estates, trusts, and other beneficial interests," in turn provided, in relevant part, as follows:

(B) Unless the power of attorney otherwise provides, language in a power of attorney granting general authority with respect to estates, trusts, and other beneficial interests authorizes the agent to do all of the following:

* * *

(6) Conserve, invest, disburse, or use anything received for an authorized purpose.

{¶52} Thus, Sister, as the successor agent under Mother's power of attorney, was permitted to "disburse, or use anything received for an authorized purpose." This would have covered the period from September 2, 2015 (when Sister became the successor agent) to January 31, 2016 (the last day Mother served as trustee of her trust).

{¶53} Additionally, as relevant to the addition to Sister's home to provide housing for Mother, Section 14 of Mother's power of attorney provided that "[m]y Agent can enter into transactions with me or in my behalf in which my Agent is personally interested so long as the terms of the transaction are fair to me, notwithstanding any law prohibiting acts of self-dealing."

{¶54} The issues, therefore, become whether Sister disbursed or used trust funds for an authorized purpose and whether construction of the addition to Sister's home was fair to Mother. These issues will be discussed below when we examine the manifest weight of the evidence.

### 3. Mother's Revocable Living Trust

{¶55} Mother's Trust, executed in 1994, designated Mother as the settlor, primary beneficiary, and original trustee. Father was designated as the first contingent trustee and, in the event he could not serve or upon his death, Brother and Sister were designated as cotrustees. On January 27, 2016, Mother executed a written "Trustee Resignation" document, giving notice of her resignation effective February 1, 2016. As Father had already passed, the written resignation acknowledged that Brother and Sister would serve

- 21 -

as cotrustees of the trust. Both parties testified that Mother took them to the bank to have their names added to the trust checking account.

{¶56} The terms of Mother's Trust gave general powers to the trustee, addressing 30 different subjects, covering a wide range of common topics. Germane to this appeal, it permitted the trustee to designate signatories on bank accounts. Article V, entitled "Powers of Trustee," provided in relevant part:

> Section 5.01 Power of Trustee to Designate Signatories
>
> 29. The Trustee shall have the power and authority to designate the authorized signature or signatures on accounts with banks, credit unions, and savings and loan associations whether such signatories be a Trustee or not.

{¶57} Finally, Mother's trust set forth the types of distributions that were permissible by the trustee during the settlor's (Mother's) lifetime. Article III, Section 3.01 required the trustee to:

> pay to or apply for the benefit of the Settlor all of the net income from the Trust Estate. In addition thereto the *Settlor shall have the right at any time to withdraw all or any part of the principal of the Trust Estate for any purpose or reason whatsoever.*

(Emphasis added.)

{¶58} Brother does not address the authority and powers conferred under Mother's Trust agreement. Instead, he relies entirely upon the limited authority granted under Mother's power of attorney in arguing Sister made improper gifts. With the exception of the Lexus, Brother's arguments deal with gifts or alleged self-dealing transactions that were derived from use of the trust checking account. Thus, in order to determine whether Sister was in fact authorized to make these gifts, we must apply the trust terms to the facts of this case.

{¶59} As the last sentence in Article III, Section 3.01 makes clear, Mother had the right to withdraw all or any part of the trust principal "*for any purpose or reason whatsoever.*"

(Emphasis added.) This very broad language certainly included Mother's ability to withdraw funds to make gifts to whomever she chose.

{¶60} Mother's Trust granted the trustee the power and authority to designate signatories on trust bank accounts and specifically stated that such signatories were not required to be a trustee. Sister testified in her deposition that she began to write checks on her Mother's behalf from the trust checking account prior to 2015. Sister explained that when she started paying the bills, Mother did not have her sign any document related to her authority to sign the checks but Mother let the banks know by mid-2015 that Sister had authority.

{¶61} Mother's Trust does not address what steps, if any, must be taken in order to become a signatory on the trust bank accounts. Typically, a bank requires the principal and agent or signatory to physically appear in order to have the principal acknowledge his or her intent to add the signatory's name to the account and sign documents evidencing the same. There is no indication that this was done when Mother made the banks aware that Sister had the authority to sign on the trust's behalf when she took over paying bills for Mother. As Mother's Trust agreement is silent as to the specific steps that are required to be a valid signatory on the trust bank accounts, we find, based upon the record before us, Mother's verbal authority as trustee was all that was required for Sister to become a signatory on the trust checking account.

{¶62} Finally, effective February 1, 2016, when Mother resigned as trustee, Brother and Sister became cotrustees of Mother's trust. Sister served as cotrustee beyond the date of the last challenged transaction, which was the transfer of the Lexus, a non-trust asset, on July 20, 2016. While serving as cotrustee, Sister was bound by the terms of Mother's Trust agreement as set forth in Article III, Section 3.01, which required the trustee to honor the Settlor's right to "withdraw all or any part of the principal of the Trust Estate for any

purpose or reason whatsoever." This would include, if proven, monies Mother desired to withdraw from her trust for the purpose of making gifts to selected individuals.

{¶63} In conclusion, Sister had legal authority to make gifts on Mother's behalf, either under the power of attorney in conjunction with Mother's Trust or solely under the trust as a signatory or a cotrustee, so long as she could establish that this was Mother's intent. This accounts for all gifts made using trust assets. Sister's legal authority to transfer the Lexus, a non-trust asset, will be addressed below. Therefore, Brother's argument that Sister lacked legal power to make the gifts using Trust assets is not well taken and his assignment of error is overruled to this extent. Whether Sister established that she used this authority in accordance with Mother's donative intent will be discussed below.

## C. Manifest Weight of the Evidence

{¶64} Brother claims that there was not competent, credible evidence admitted at trial to support the trial court's decision in favor of Sister. He contends that Sister's testimony was self-serving and contained inadmissible hearsay statements of Mother's intent to make gifts during Mother's lifetime. Even if the hearsay statements were properly admitted, he asserts that there was still insufficient evidence establishing Mother's competency and her intent to make gifts as Sister failed to present corroborating evidence.

{¶65} Factual challenges to a trial verdict are considered on appeal under a manifest-weight-of-the-evidence standard. *Newcomer v. Natl. City Bank*, 6th Dist. Williams No. WM-12-007, 2014-Ohio-3619, ¶ 10. In considering a manifest weight of the evidence challenge, a reviewing court weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created a manifest miscarriage of justice warranting reversal. *Chasteen v. Dix Rd. Property Mgt.*, 12th Dist. Butler Nos. CA2020-04-055 and CA2020-04-056, 2021-Ohio-463, ¶ 43. In weighing the evidence, the reviewing court must

always be mindful that "'every reasonable presumption must be made in favor of the judgment and the finding of facts.'" *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 21, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984), fn. 3. If the evidence is susceptible to more than one construction, the reviewing court is bound to give it the interpretation which is consistent with the trial court's verdict and judgment. *Id.*

{¶66} Sister contends that Brother did not raise the issue of Mother's competency until filing objections to the magistrate's decision. Sister is correct that Brother did not raise the issue of Mother's competency in his complaint, motion for summary judgment, or in his pretrial statement. When examining Sister on the first day of trial, Brother's counsel presented Sister with a letter from Father's and Mother's long-time family physician, Dr. Jan Froehlich, attempting to substantiate his belief that both parents had been incapable of handling their affairs. The following exchange then occurred:

> [Brother's Counsel]: Are you aware of any letter from [Dr. Froehlich] that stated that both of them lost capacity, and that they were no longer physically or psychologically able to handle their affairs?
>
> [Sister's Counsel]: I'm going to object to that. That's – I've never heard of this before. It's not in the complaint.
>
> [Brother's Counsel]: I'm asking if she's aware of the letter. I'm not using it for the truth of the matter asserted. I just want to know if she's aware of it.
>
> [Sister's Counsel]: No, he's gone into what the letter said.
>
> THE COURT: Are you prepared to raise some capacity argument?
>
> [Brother's Counsel]: Well, I want to know – we did with father's capacity and argument there. But I want to hear about mom.
>
> THE COURT: I'll allow it for that limited purpose.
>
> [Brother's Counsel]: Now, did their long-time physician – are you aware of a letter from the long-time physician?

[Sister]:  Yes.

[Brother's Counsel]:  Okay.  And is it your position that you disagree with the letter that they were – is it your position that she wasn't incapacitated or able to handle her affairs?

[Sister]:  She had dementia.  So what dementia means is sometimes you are out there and other times you are there.  You just don't know.

[Brother's Counsel]:  And did your mom have those in and out intervals of not –

[Sister]:  Towards the end, yes.

[Brother's Counsel]:  Okay.

[Sister]:  But I was at the doctor with my mother when we got this letter.  I have gone to the doctor's office with my mother and with my father and it was a matter of mom had duplicated a check that she paid Chase Bank and it worried her to death.  So I asked Jan if she could help or what she could do, Froehlich, the doctor.  And she said she could write a letter and that would help alleviate some of mom's problems and worries and then we could just deal with it.

[Brother's Counsel]:  Was that an effort to get you on or allow you access to certain accounts.

[Sister]:  Yes, to the checking accounts.

[Brother's Counsel]:  And that, you said, was in March or spring 2015?

[Sister]:  I don't remember that time frame.  I just remember going to the doctor with mom and we had the conversation with Jan.

Other than this exchange, there was no discussion relating to Mother's competency.

{¶67}  After the trial concluded, the magistrate instructed the parties to file post-trial briefs.  Brother also failed to raise the issue of Mother's competency in his post-trial brief.  As a result, the magistrate did not address this issue in her written decision.

{¶68}  Brother finally raised the issue for the first time in his objections to the magistrate's decision.  The trial court overruled Brother's objections, stating in relevant part

the following: "While [Brother] claims his parents were not able to tend for themselves or make spending decisions from 2015 until their deaths, he makes no allegations that his parents were incompetent or declared incompetent. This Court would note that it is without jurisdiction to make such a competency finding."

{¶69} We find no error in the trial court's holding. In ruling on objections to a magistrate's decision, a trial court is limited to reviewing issues actually presented to and decided by the magistrate. "Where, as here, an objection raises an issue not presented or decided by the magistrate, the objecting party is improperly asking the court to reach a different decision based on a new ground. The court does not have this authority under Civ.R. 53(D)(4)." *Abernathy v. Abernathy*, 8th Dist. Cuyahoga No. 91735, 2009-Ohio-2263, ¶ 12. The trial court, therefore, correctly determined it was without authority to make a finding as to the untried issue of Mother's competency. As competency was not an issue raised below, we cannot address it for the first time on appeal. *Kennedy v. Kennedy*, 12th Dist. Warren No. CA83-09-069, 1984 Ohio App. LEXIS 10877, *9 (Sept. 17, 1984).[7]

{¶70} As for the gifts at issue, we note that "[t]o establish an inter vivos gift, the following essential elements must be met: '(1) intent of the donor to make an immediate gift, (2) delivery of the property to the done, and (3) acceptance of the gift by the done.'" *Sieber v. Sieber*, 12th Dist. Butler Nos. CA2014-05-106 and CA2014-05-114, 2015-Ohio-2315, ¶ 23, quoting *Casper v. Casper*, 12th Dist. Warren Nos. CA2012-12-128 and CA2012-12-129, 2013-Ohio-4329, ¶ 12. "The donee has the burden of showing by clear and convincing evidence that the donor intended an inter vivos gift." *Id.* "Clear and convincing evidence means that degree of proof that will provide in the mind of the trier of fact a firm

_____

7. Even if we were able to address Mother's competency, there was sufficient credible evidence in the record establishing her competency pursuant to the factors identified in *In re Estate of Lucitte*, 6th Dist. Lucas No. L-10-1136, 2012-Ohio-390, ¶ 82. Brother testified that Mother, along with Father, provided input on the decision to build the addition. He acknowledged Mother also made sizeable gifts to him during the relevant time period. He also expressed the sentiment in his trial testimony that if "Mother wanted to do it, it was okay to do it."

belief or conviction as to the facts sought to be established." *Flynn v. Flynn*, 196 Ohio App.3d 93, 2011-Ohio-4714, ¶ 39 (12th Dist.).

{¶71} There are two distinct presumptions that come into play here regarding the gifts. One presumption is that a gift is ordinarily presumed when there is an existence of a family relationship. *In re Estate of Lilley*, 12th Dist. Warren Nos. CA2005-08-091, CA2005-08-092, CA2005-08-095, and CA2005-08-096, 2006-Ohio-5510, ¶ 29. The other is the presumption of undue influence where the donee held a fiduciary relationship with the donor. *Id.* In analyzing these two presumptions simultaneously, we have stated that "[w]hile the existence of a family relationship ordinarily gives rise to the presumption of a gift, where a confidential or fiduciary relationship exists between the donor and the donee, there is a suspicion that the donee may have exerted undue influence on the donor." *Id.*, citing *Brooks v. Bell*, 1st Dist. Hamilton No. C-970548, 1998 Ohio App. LEXIS 1476, *13 (Apr. 10, 1998). In those circumstances, "the family gift presumption yields to a presumption that the transfer was a result of undue influence, and the party in the superior position must come forward of proof of the validity of the transfer." *Id.*, citing *In re Guardianship of Marshall*, 12th Dist. Butler No. CA96-11-239, 1998 Ohio App. LEXIS 2275 (May 26, 1998). "Nevertheless, the party contesting the gift retains the ultimate burden of proving undue influence by clear and convincing evidence." *Id.*

{¶72} "'The existence of an inter vivos gift is ordinarily a question of fact.'" *Casper*, 2013-Ohio-4329 at ¶ 12, quoting *In re Estate of Lilley* at ¶ 30. "As to questions of fact, we give deference to the trial court, which is best able to observe the witnesses and weigh the credibility of their testimony." *Id.*

{¶73} Based on these principles of law, Sister had the burden to (1) prove by clear and convincing evidence that all the elements of an inter vivos gift were met and (2) overcome the presumption that the gifts were made as a result of undue influence due to

her fiduciary relationship with Mother. Once Sister met her burdens, Brother retained the ultimate burden of proving undue influence by clear and convincing evidence. With these principles in mind, we turn to the contested transactions.

**1. Trust Assets**

{¶74} We note that with respect to the gifts Sister received from the trust assets, the only element of an inter vivos gift that Brother challenges is the donor's intent to make an immediate gift. Brother asserts that because Sister's testimony about Mother's intent to make these gifts was entirely self-serving, the evidence should be "steeply discounted" in weight.

a) The Addition

{¶75} As to the addition to Sister's home, Sister testified at trial that the addition project was discussed by the parties and their parents when they were all together at Father's nursing home. Sister claims that during this talk, there was an agreement between Mother and Father that they would pay for the addition to Sister's home and it would remain Sister's property in exchange for Sister taking care of Mother. Sister tried to discuss the matter in further detail with Brother, but he did not want any part of it, stating that it would be too much work for Sister to care for Mother. Sister explained Mother indicated that she never wanted to go into a nursing home and wanted to be taken care of by her children. Sister testified that the cost of the addition increased due to the upgrades their parents wanted. These upgrades added costs to the addition project.

{¶76} Brother's recollection of the conversation they had with their parents at the nursing home was significantly different. Brother testified that once Father was informed that the addition would cost $80,000, Father indicated that was too much money. Brother also informed the trial court that Mother wanted to die at her own home and did not want to stay at Sister's home.

- 29 -

b) Credit Card Purchases

{¶77}  As for the credit card purchases, there is no dispute that Mother's credit card bills were paid for with funds from the trust checking account and that since mid-2015, Sister wrote the checks from this account.  When deposed, Sister stated that the purchases were 100 percent for Mother and that she did not get any personal benefit from use of the credit card purchases.  However, Sister did disclose that a couple of purchases were for her personal use, but she represented she reimbursed the trust for those expenses.  For instance, after accidentally paying for a personal dental bill with one of Mother's credit cards, which in turn was paid off using funds from the trust checking account, Sister repaid the sum of money to the trust.

{¶78}  Brother testified that after looking at the sums of money that were spent at the various department and retail stores, grocery stores, and gas stations, he found it difficult to believe that all the purchases were only for Mother's and Father's benefit.  Brother claimed that Mother never shopped at high-end department stores like Dillard's and Nordstrom and that his parents were frugal with their money during their lifetime.  He recalled that Father wanted cable television, but Mother refused to pay for it until the last five years of Father's life because Mother thought it was too expensive.

{¶79}  Sister denied that her parents were frugal with their money.  She pointed out that Mother had three walk-in closets full of clothing and over 12 sets of china dinnerware sets.  Also, while her parents were still living in their home, Mother directed Sister to spend trust assets for the purchase of a new television, two new chairs, a bed and mattress, new carpeting for the kitchen, and $20,000 for a concrete driveway for their home.

c) The Boat

{¶80}  With respect to the boat, Brother contended that after Mother's death, when reviewing the trust's bank records, he discovered Sister's use of the trust checking account

to purchase a boat for $18,000 from Caesar's Creek Marina. The boat was placed in Sister's husband's name and was sold about a year after its purchase. When Brother confronted Sister about purchase of the boat, Brother claims Sister stated she paid for the boat, which Brother believed was a lie.

{¶81} When deposed, Sister testified that Father wanted to give her $20,000 for her efforts in caring for Mother. At trial, Sister testified that Father and Mother wanted Sister and her husband to have $20,000 for ongoing expenses related to Mother's addition.

### d) Credibility Determination

{¶82} After hearing the conflicting testimony presented by the parties regarding their parents' desires and Mother's intent to make inter vivos gifts to Sister, the magistrate was required to determine the credibility of the witness. The magistrate ultimately found Sister's testimony more credible than Brother's, which resulted in the magistrate finding that Mother intended to make the gifts to Sister. Contrary to Brother's assertions, the magistrate's decision was not against the manifest weight of the evidence.

{¶83} It is not unusual for a trier of fact to hear conflicting testimony from two different parties. *Lane v. Brewster*, 12th Dist. Clermont No. CA2011-08-060, 2012-Ohio-1290, ¶ 55. It is up to the trial court to determine the weight and credibility of each witness' testimony, with the trier of fact being "free to believe all, part, or none of the testimony of each witness." *Bartells v. Bertel*, 12th Dist. Butler No. CA2016-11-216, 2018-Ohio-21, ¶ 63. The trier of fact is "better able 'to view the witnesses and to observe their demeanor, gestures, and voice inflections and then use those observations in weighing credibility.'" *Lane* at ¶ 55, quoting *Smith v. Wunsch*, 162 Ohio App.3d 21, 2005-Ohio-3498, ¶ 22 (4th Dist.).

{¶84} Here, the magistrate heard the conflicting testimony from Sister and Brother regarding Mother's intent to make the gifts. The magistrate gave appropriate weight to

Sister's testimony of Mother's donative intent and found Sister's testimony to be more credible than Brother's. In her testimony, Sister appeared upfront, honest, and, at times, truthful to a fault. Sister did not seek to conceal the transactions, but rather testified openly about items purchased at Mother's direction, gifts Mother directed Sister to make – both to Brother and to Sister, and accidental payments Sister made from the trust which required Sister to reimburse the trust, such as payment of Sister's dental bill.

{¶85} Both Brother and Sister's testimony demonstrated that Mother and Father made gifts to Brother, his children, and Sister over the years. Not only does their testimony demonstrate that it was not out of the ordinary for Mother and Father to make gifts to their family members, but the evidence offered at trial demonstrated that Brother and his children received gifts from Mother during the same time period Brother contends Sister improperly made gifts to herself from the trust checking account. The fact that Mother made gifts to Brother during this time period supports Sister's claim that Mother directed gifts to be made to Sister as well.

{¶86} Additionally, as there was testimony that Sister provided the day-to-day care of her parents and was willing to continue to do so as they aged and need more assistance, it made sense that Mother and Father would pay for the cost of the addition to Sister's home, where they intended to reside. At trial, Brother acknowledged the costly expense for nursing home care and admitted that if his parents had lived longer, the outlay for the addition would have been cheaper than the cost of his parents living in a nursing home. Brother further admitted that Mother had the ability to spend her own money as she saw fit, and, as we stated earlier, "so long as Mother wanted to do it, it was okay to do it." (Oct. 7, 2018 Trial p. 199.)

{¶87} Based on the evidence introduced at trial, we find that Sister established the elements of an inter vivos gift and overcame the presumption of undue influence. Brother

failed to present any credible evidence that any particular gift or expenditure was not made at Mother's direction and he failed to present clear and convincing evidence that Sister unduly influenced Mother into making the gifts. After weighing the evidence and all reasonable inferences, and considering the credibility of witnesses, we cannot say that the trial court, in resolving conflicts in the evidence, clearly lost its way and created a manifest miscarriage of justice warranting reversal. Brother's manifest weight arguments are without merit and are hereby overruled.

### D. Lexus

{¶88} The final issue presented by Brother is related to Sister's transfer of the Lexus following Mother's death. Brother argues that because the vehicle was titled in Mother's name at the time she died, the vehicle should have passed to both him and Sister under the terms of Mother's Last Will and Testament. Brother contends that by transferring the vehicle to herself after Mother's death, Sister intentionally interfered with his expected inheritance. He argues the trial court erred in finding his parents made a gift of the vehicle to Sister given that two of the three necessary elements for an inter vivos gift were not met, namely, the intent of the donor to make an immediate gift and acceptance of the gift by donee.[8]

{¶89} Sister asserted in her brief that the Lexus should have been included in Father's estate since it was originally titled in his name. Because it was a probate asset, the general division of the common pleas court lacked jurisdiction to rule on this alleged gift to Sister. In Brother's reply brief, he concedes that Mother's estate would have a claim of conversion against Sister, but this does not prevent a "parallel claim" by Brother in the general division of common pleas court.

---

8. We note that the transfer of the Lexus is the only "gift" for which Brother challenged the timing element of an inter vivos gift in addition to Mother's intent to make the gift.

{¶90} We find that the trial court erred in deciding the tort claim involving the Lexus, an asset that did not belong to the trust at the time of Mother's death, but rather, was Mother's personal property. As the Tenth District Court of Appeals has explained, "before pursuing an [intentional interference with expectancy of inheritance] claim, a plaintiff must first exhaust all appropriate remedies in the probate court." *Wickline v. Hoyer*, 10th Dist. Franklin No. 11AP-694, 2012-Ohio-945, ¶ 14, citing *Firestone v. Galbreath*, 10th Dist. Franklin No. 92AP-159, 1992 Ohio App. LEXIS 5219 (Oct. 6, 1992). *See also Roll v. Edwards*, 156 Ohio App.3d 227, 2004-Ohio-767, ¶ 28 (4th Dist.) (a claim for intentional interference with expectancy of inheritance may not be pursued if adequate relief is available to the plaintiff through probate procedures); *Patterson v. Church*, 8th Dist. Cuyahoga No. 99159, 2013-Ohio-1906, ¶ 10, 23 (common pleas court lacked subject matter jurisdiction over the plaintiff's claims for tortious interference with expectancy of inheritance because the probate court had exclusive jurisdiction).

{¶91} Brother could have availed himself of an R.C. 2109.50 action with the local probate court during the administration of Mother's estate to undo the alleged concealment of the Lexus from the estate. As co-executor of Mother's estate, Brother was aware that the Lexus was not reported as an asset of Mother's estate. The vehicle was not included in the inventory, the schedule of assets, nor the final account, the latter of which was filed August 3, 2017.

{¶92} As Brother did not file a concealment of asset action in the probate court, he failed to exhaust his probate remedies. Therefore, whether Sister intentionally interfered with Brother's expectancy interest in the Lexus was not a proper consideration in the general division of the court of common pleas. *See Grimes v. Grimes*, 173 Ohio App. 537, 2007-Ohio-5653, ¶ 33 (4th Dist.). We therefore find that the trial court lacked jurisdiction to render judgment on Brother's claim of tortious interference with expectancy of inheritance.

## III. CONCLUSION

{¶93} For the reasons expressed above, Brother's sole assignment of error is overruled in part and sustained in part. As the trial court improperly exercised jurisdiction over Brother's claim of tortious interference with expectancy of inheritance as it related to the transfer of the Lexus, we vacate the trial court's judgment to that extent and remand the matter with instructions to dismiss that claim without prejudice. In all other respects, the judgment of the trial court is affirmed.

PIPER, P.J., and M. POWELL, J., concur.